SMITH, Appellee,

v.

GOODWILL INDUSTRIES OF THE MIAMI VALLEY, INC., Appellant.

[Cite as *Smith v. Goodwill Industries of the Miami Valley, Inc.* (1998), 130 Ohio App.3d 437.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16906.

Decided Oct. 30, 1998.

438

*Susan S. Silberstein*, for appellee.

*Todd D. Penney*, for appellant.

WOLFF, Judge.

Goodwill Industries of the Miami Valley, Inc. ("Goodwill") appeals from a judgment of the Montgomery County Court of Common Pleas, which affirmed a decision of the Dayton Human Relations Council ("DHRC"). The DHRC had ruled that Goodwill had discriminated against Veronica Smith based on race.

The facts established at the DHRC hearing are as follows.

Goodwill, a nonprofit corporation, provided janitorial services to public and private sector organizations in the Dayton metropolitan area. In providing these services, Goodwill placed a priority on giving employment opportunities to disabled and disadvantaged individuals. Goodwill's clients for janitorial services included the United Way and Wright Patterson Air Force Base ("WPAFB").

Smith, a black woman, was hired by Goodwill in December 1993 as an on-call janitor. On occasion, Smith also performed the duties of her supervisor, Hester Allison, and worked as a secretary. Allison promoted Smith to janitorial contracts coordinator on March 16, 1994, based on her competent performance. In this position, Smith was responsible for numerous janitorial contracts, including the United Way building. Allison supervised Smith throughout Smith's employment with Goodwill.

In late June 1994, the head of maintenance at the United Way building notified Goodwill that the agency was dissatisfied with Goodwill's cleaning services. Specifically, the United Way complained about the floor and carpet care. Smith reported these concerns to Allison and remained in close contact with the United

Way about any additional concerns. As a result of Smith's efforts, the United Way did not have any additional complaints from June 24 through July 6, 1994.

On July 7, 1994, Smith was removed from the United Way contract due to cleaning problems at the building and her response to a voice-mail message from the United Way chief executive officer regarding cleaning problems at the building. Smith was terminated on July 15, 1994. Smith subsequently sent a letter to the president of Goodwill, the human resources director, and Allison seeking to reaffirm Allison's reasons for discharging her as being her failure to complete certain mailings and the cleaning problems at the United Way. Smith received no response to the letter.

On August 24, 1994, Smith filed a charge of racial and sexual discrimination with the DHRC. After a hearing, the DHRC found that Goodwill had discriminated against Smith based on race, but it did not find support for Smith's sexual discrimination claim. Goodwill appealed the finding of racial discrimination to the Montgomery County Court of Common Pleas, which affirmed the decision of the DHRC.

Goodwill asserts two assignments of error on appeal to this court. We will address these assignments in the order that facilitates our discussion, rather than the order in which they are presented.

"II. The court of common pleas erred in not finding the decision of the Dayton Human Relations Council unreasonable and unsupported by the preponderance of the evidence."

Goodwill claims that Smith did not establish a prima facie case of race discrimination because she did not demonstrate that she was qualified for her position or that she was treated differently from similarly situated white employees. Goodwill also claims that, even if Smith had established a prima facie case of discrimination, Goodwill rebutted her evidence with legitimate, nondiscriminatory reasons for her termination, and that Smith had failed to prove that the reasons offered by Goodwill were a pretext for discrimination.

Dayton Revised Code of General Ordinances 32.03(A)(1) provides that it shall be an unlawful discriminatory practice for any employer to "[r]efuse to hire or discharge any person or otherwise to discriminate against any person with respect to hire, compensation, tenure, term, conditions, or any matter directly or indirectly related to employment because of such person's race." The plaintiff carries the initial burden of establishing a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 801–803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677–678, followed in *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 251–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 214–215. The plaintiff establishes a prima facie case of discrimination by

showing the following: (1) he belongs to a protected class, (2) he was qualified for the position that he held, (3) he was terminated despite his qualifications, and (4) he was replaced by someone outside the protected class. *McDonnell Douglas*, 411 U.S. at 801–803, 93 S.Ct. at 1824, 36 L.Ed.2d at 677–678; *Burdine, supra*, at 253–255, 101 S.Ct. at 1094, 67 L.Ed.2d at 215–217. If the plaintiff establishes a prima facie case, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. After the employer has done so, the plaintiff must be afforded an opportunity to show that the employer's proffered reason is a pretext for discrimination. *McDonnell Douglas, supra*, 411 U.S. at 801–805, 93 S.Ct. at 1824–1825, 36 L.Ed.2d at 677–679; *Burdine, supra*, 450 U.S. at 251–253, 101 S.Ct. at 1093, 67 L.Ed.2d at 214–215.

It is undisputed that Smith belonged to a protected class and that she was terminated from her position. Goodwill disputes, however, that she was replaced by a person outside the protected class and that she was qualified for her position. In support of its argument that Smith was not replaced by someone outside the protected class, Goodwill relies on the fact that it hired Tina Thomas, a black woman, to replace Smith as the janitorial contracts coordinator. Goodwill apparently asserts that it was irrelevant that Thomas resigned five days after she took the job and that the two employees who held the position after Thomas were white.

The evidence showed that Tina Thomas was a college graduate with a degree in psychology and that she was hired for the position of janitorial contracts coordinator on August 8, 1994, notwithstanding a hiring freeze announced on July 24, 1994. Thomas resigned on August 12 in a letter citing her lack of experience and managerial skills. As Thomas's supervisor, Allison completed a form entitled Termination From Employment, stating that Thomas had felt she was not ready for a supervisory role. Both the letter and the form were undated. After Thomas resigned, the janitorial contracts coordinator position remained unfilled for some time. The janitorial contracts coordinator position was then combined with the new position of assistant director of janitorial contracts, and Brian Dabe was hired to fill the new position in October 1994. In that position, Dabe took over some of the responsibilities Smith had borne as the janitorial contracts coordinator. Dabe appeared to be white, but in fact he was an American Indian. When Dabe was terminated in early 1995, his position was filled by a white man.

Based on this evidence, the hearing examiner concluded that "the installation of an untrained Thomas for a minuscule period of time did not break the chain of events sufficiently to conclude that Smith was replaced by someone within the protected class." The hearing examiner found that the *McDonnell Douglas/Burdine* test was not intended to be so rigid, mechanized, or ritualistic that Thomas's

five-day employment as janitorial contracts coordinator compelled the conclusion that Smith had been replaced by someone of her own race or prohibited looking further into Goodwill's employment patterns. Applying these standards, the hearing examiner concluded that Smith had made a prima facie showing that she had been replaced by someone outside the protected class, notwithstanding Thomas's very brief employment as janitorial contracts coordinator.

■ The hearing examiner also noted that the courts have recognized an alternative to the element of replacement by a nonprotected person of the *McDonnell Douglas/Burdine* test. *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582–583. See, also, *O'Connor v. Consol. Coin Caterers Corp.* (1996), 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433. "[A] plaintiff can also make out a *prima facie* case by showing, in addition to the first three elements, that 'a comparable non-protected person was treated better.'" *Mitchell,* 964 F.2d at 582. To satisfy this element, the plaintiff must produce evidence that he was treated differently for the same or similar conduct than similarly situated nonminority employees. *Id.* at 583.

■ Goodwill pointed to Smith's alleged poor performance and attitude problems to show that she had failed to establish a prime facie case of discrimination under either the *McDonnell Douglas/Burdine* test or its *Mitchell* variation. Specifically, Goodwill claimed that Smith had failed to satisfy the second prong of the *McDonnell Douglas/Burdine* test because her performance demonstrated that she was not qualified for the job she had held and that she had failed to satisfy the *Mitchell* test because she was not similarly situated to other nonminority employees due to her poor performance. Assuming, *arguendo,* that Smith had established a prima facie case, Goodwill also relied on Smith's alleged poor performance and attitude problems to demonstrate that it had had a legitimate nondiscriminatory reason for terminating her. Because each of these arguments is based upon Smith's alleged poor performance and attitude, we will consider them together. In assessing the legitimacy of Goodwill's reasons for terminating Smith, we will also consider whether the evidence demonstrated that the reasons cited were a pretext for racial discrimination.

As the hearing examiner noted, it was undisputed that there had been some complaints about the janitorial services in the United Way building under Smith's supervision and that she had exhibited questionable conduct toward Allison. In the abstract, these shortcomings might have justified Smith's termination. However, the hearing examiner found that other similarly situated employees had not been terminated for such problems. Several white supervisors had demonstrated poor attitudes or had been argumentative with Allison but had not been terminated. Rather, these other employees had received memoranda and verbal warnings concerning their behavior, had been suspended, or had been temporarily

demoted to their previous positions. Some white employees had been given years to correct performance problems, whereas Smith was given only two weeks to do so. Smith received no written or verbal warning from Allison that she was risking termination due to performance problems with the United Way or attitude problems, nor was she demoted to her prior position as a janitor, even though the parties agreed that she had done a good job as a janitor. Based on this evidence, the hearing examiner found, albeit implicitly, that Smith was as qualified for her position as other comparable supervisors who had not been disciplined, and that the severity of Goodwill's discipline of Smith compared to that of other white supervisors supported the inference that Smith's termination was pretextual.

The hearing examiner also found credible the unrefuted testimony of a Goodwill employee, Reginald Young, that Allison had made racist comments in his presence. Young had also complained to Goodwill President William Jessee about the treatment of and high turnover rate among black employees and the lack of black supervisors. Indeed, at the time Smith was a supervisor, there were only two other black janitorial supervisors at Goodwill, and those two supervisors were the only two supervisors paid by the hour rather than on salary. The hearing examiner found that Goodwill's practices showed a pattern of differential treatment between white and black employees. Thus, the hearing examiner concluded that Smith had established a prima facie case of disparate treatment based on race and that the nondiscriminatory reason advanced by Goodwill was a pretext. The trial court found that these conclusions were supported by the record, and we agree.

Goodwill contends that there were no other employees who had engaged in conduct similar to Smith's to use as a basis for comparison. In support of this argument, Goodwill points to an alleged conversation between Allison and Smith on July 7, 1994, shortly before Smith's termination. During that conversation, Allison played for Smith a voice-mail message from the chief operating officer of the United Way complaining about the janitorial services at the building and stating that the contract was in jeopardy if services were not improved. In response, Smith allegedly laughed and shrugged her shoulders. Goodwill claims that this confrontation precipitated Allison's decision to terminate Smith, that this confrontation was ignored by the hearing examiner, and that no other supervisor was comparable to Smith because none had engaged in such egregious conduct. Goodwill also claims that some of the supervisors to whom the hearing examiner compared Smith had not been comparable because they worked on the WPAFB contract, which involved the supervision of disabled employees.

Smith's alleged conduct on July 7, 1994, in response to the voice-mail message, was supported only by Allison's testimony, a memorandum Allison had written to

Smith's personnel file shortly after the meeting, and a July 8, 1994 memorandum from Smith to Allison attempting to document what had happened at the meeting. It is apparent from the hearing examiner's report that he found Allison's account of her supervisory activities unpersuasive and lacking in credibility. Allison's testimony at the hearing about Smith's reaction to the voice-mail message and her own response to Smith's actions embellished upon the version contained in her contemporaneous memorandum to the personnel file. Indeed, Allison's memorandum did not emphasize Smith's conduct in response to the voice-mail message any more than the other conduct discussed at the meeting. Moreover, Allison spoke in very general terms when she testified about Smith's unwilling-ness to recognize problems at the United Way, without placing great emphasis on the events of July 7, 1994. Smith's memorandum to Allison recapping the meeting stated that Smith's response to the voice-mail message was to say, "It's odd that a building looks good, and looking better on 6–7–94 [citing a daily report], and becomes filthy overnite." Based on this evidence, the hearing examiner could have reasonably rejected Goodwill's claim that Smith's response to the voice-mail message from the United Way significantly distinguished her conduct from that of other argumentative and confrontational supervisors.

The hearing examiner also reasonably included all of the supervisors who reported to Allison in the pool of employees to whom Smith's conduct should be compared. Although Goodwill argued that Smith's conduct could not be accu-rately compared to that of supervisors at WPAFB because those supervisors worked with a disabled workforce, Goodwill did not present evidence that the cleaning responsibilities or the expectations to which the supervisors were held varied significantly between those supervisors who worked with disabled employ-ees and those who did not. Because the hearing examiner's conclusion that "no two-tier discipline grid existed for supervisors who managed physically chal-lenged employees versus other supervisors" was supported by the record, the examiner reasonably compared Smith's treatment to the treatment of all other persons supervised by Allison.

The hearing examiner could have reasonably concluded that Smith had estab-lished a prima facie case of racial discrimination and that the nondiscriminatory reasons for Smith's termination proffered by Goodwill were pretextual. Thus, the trial court did not err in concluding that the hearing examiner's decision was supported by the record.

Goodwill's second assignment of error is overruled.

"I. The court of common pleas erred in not declaring Dayton's Revised Code of General Ordinances §§ 32.16 and 32.20 unconstitutional under Section 1, Article IV of the Ohio Constitution."

Goodwill claims that the city of Dayton acted outside its constitutional authority by enacting Dayton Revised Code of General Ordinances ("R.C.G.O.") 32.16 and 32.20, which empowered the DHRC to make and enforce orders between private parties based upon its own finding of discriminatory conduct. Goodwill contends that these ordinances are unconstitutional because they permit the DHRC to order a private party to pay compensatory damages and to impose criminal sanctions pursuant to R.C.G.O. 32.99, functions that are constitutionally reserved to the courts. In response, the city argues that the ordinances and the DHRC powers created thereby do not usurp powers constitutionally reserved to the courts because R.C.G.O. 32.20(K) provides for an R.C. Chapter 2506 administrative appeal to the courts and because the imposition of any criminal sanction would necessarily involve the courts. The city also argues that the constitutionality of the powers at issue is not ripe for judicial review because the DHRC has not yet sought to enforce its order.

As a preliminary matter, we address the city's claim that Goodwill's constitutional argument is not yet ripe for review. The substance of this dispute hinges on whether the city's provision for an R.C.Chapter 2506 administrative appeal from an order of the DHRC adequately preserved Goodwill's right to a judicial determination of the controversy. Because Goodwill has already availed itself of the R.C. Chapter 2506 appeal, the only judicial review available to it pursuant to the city's ordinances, we conclude that this matter is ripe for our review, despite the fact that the city has not yet sought to enforce its order.

Judicial power may generally be defined as "the authority vested in some tribunal to hear and determine the rights of persons or property, or the propriety of doing an act; a power involving the exercise of judgment and discretion in the determination of questions of right in specific cases affecting the interests of persons or property." *Stanton v. Tax Commr.* (1926), 114 Ohio St. 658, 671–672, 151 N.E. 760, 764. Section 1, Article IV of the Ohio Constitution provides that the judicial power of the state is vested in the Supreme Court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the Supreme Court as may be established by law. Goodwill contends that the city violated this constitutional provision in delegating judicial power to the DHRC.

It is practically impossible to precisely define the line of demarcation between the different departments of government. *Geauga Lake Improvement Assn. v. Lozier* (1932), 125 Ohio St. 565, 575, 182 N.E. 489, 492. In practice, the separation of executive, legislative, and judicial powers has never been clear and distinct. *Id.* For example, it is undisputed that investigatory and decision-making powers may be delegated to an administrative agency without running afoul of

the Constitution. "The power to investigate, to subpoena, to hear and decide is not a peculiar attribute of the judicial department. * * * [I]t has never been held that the possession of [these] power[s], *ipso facto*, transmuted an administrative agency into a judicial tribunal." *Meyer v. Parr* (1941), 69 Ohio App. 344, 348, 24 O.O. 110, 111, 37 N.E.2d 637, 640. Thus, we find no constitutional infirmity in the city's delegation to the DHRC of the power to investigate claims of discrimination and to make findings as to whether discrimination had occurred in various situations. Whether the city could empower the DHRC to make orders affecting the rights of private parties based upon its own finding of discrimination presents a more difficult question because this function more closely resembles the exercise of power reserved exclusively to the courts.

■ Due process of law guarantees that all persons are entitled to a judicial inquiry into any controversy affecting the rights of persons or property. *Stanton*, 114 Ohio St. at 675–676, 151 N.E. at 765–766, citing *Ohio Utilities Co. v. Public Util. Comm. of Ohio* (1925), 267 U.S. 359, 45 S.Ct. 259, 69 L.Ed. 656, and *Ohio Valley Water Co. v. Ben Avon Borough* (1920), 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908. It does not necessarily follow, however, that the submission of such a controversy to an administrative tribunal violates due process, so long as a party aggrieved by an administrative decision has a right to judicial review of the determination. The Supreme Court discussed this issue in *Stanton*, 114 Ohio St. at 664, 151 N.E. at 762, as follows:

"[T]he separate powers of the government are not required to be kept entirely separate and distinct, in the sense that there must be no common link of connection or dependence, but rather that the 'whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments.' If no appeal is permissible [from the decision of an administrative board], then the whole power over this controversy [affecting the rights of persons or property], which is judicial in nature, will be reposed in an administrative board."

■ *Stanton* concluded that matters usually classified as being of judicial cognizance may be submitted for determination to administrative boards and commissions without violating the requirements of due process, if provision is made for judicial review. *Id.* at 675, 151 N.E. at 765. See, also, *In re Wozniak* (Apr. 30, 1985), Franklin App. No. 84AP–602, unreported, 1985 WL 10268 (stating that administrative agencies may constitutionally exercise quasi-judicial powers, provided such exercise is subject to judicial review); 2 Ohio Jurisprudence 3d (1977), Administrative Law, Section 34. Moreover, it is well established that legislative enactments such as the ordinances at issue here enjoy a strong presumption of constitutionality. *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 10, 539 N.E.2d 103, 111.

The city argues that the Dayton ordinances' provision for judicial review pursuant to R.C. Chapter 2506, set forth in R.C.G.O. 32.20(K), adequately ensures one's right to judicial review of a DHRC order. R.C. 2506.04 provides that the trial court may affirm, reverse, vacate, or modify an administrative order if the order is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence. Thus, although a party aggrieved by a DHRC order is not entitled to have the trial court hear the matter *de novo*, the review afforded pursuant to R.C. Chapter 2506 is significant.

The R.C. Chapter 2506 review of DHRC decisions is comparable to the judicial review provided for decisions of the Ohio Civil Rights Commission ("OCRC") and the National Labor Relations Board ("NLRB"), other agencies that hear and decide claims and whose procedures Goodwill seems to endorse. R.C. 4112.06 provides that the findings of the OCRC shall be conclusive if they are supported by the record, that the court shall not take additional evidence except in narrow circumstances, and that trial court may enforce, modify, enforce as modified, or set aside in whole or in part an order of the OCRC. Likewise, Section 160(e), Title 29, U.S.Code sets forth nearly identical procedures for claims before the NLRB. Thus, we have little doubt that the extent of judicial review provided for in the Dayton ordinances is adequate to satisfy due process requirements.

Goodwill contends that the Dayton ordinances are constitutionally different from the enabling statutes of the OCRC and the NLRB because those statutes specifically provide for the agencies to seek enforcement of their orders through the courts, whereas the Dayton ordinances do not. We do not find this distinction to be significant under the facts of this case, however. The DHRC's order in this case was reviewed by the trial court pursuant to R.C. Chapter 2506, albeit at Goodwill's request. We do not know whether the city would have sought the court's approval of the order if Goodwill had not appealed, nor do we know the extent to which the city will rely on the courts in the future for the enforcement of its order or the potential criminal sanctions set forth at R.C.G.O. 32.99. We will not speculate on these issues, and we will not presume that, at some point in the future, the city will act in a way that contravenes Section 1, Article IV of the Ohio Constitution, especially since the city claims that it intends to enforce its order through the courts. If the city does take further action without court involvement, Goodwill may seek judicial intervention at that point.

We find *Burke v. Fought* (1978), 64 Ohio App.2d 50, 18 O.O.3d 32, 410 N.E.2d 1255, a case upon which Goodwill relies, to be unpersuasive. In *Burke,* a Toledo ordinance allowed a particular official to investigate consumer sales practices violations along with persons under his supervision, to find probable cause, to issue complaints, to hold hearings and rule on the admissibility and weight of

evidence, and to issue cease-and-desist orders based on the preponderance of the evidence. In a decision that was closely tied to the facts of the case, the court of appeals held that, even in the realm of administrative law, where the commingling of investigative and adjudicative functions is sanctioned more than would ever be permitted in a court of law, the official's partisan and judicial involvement necessarily involved a lack of due process. *Id.* at 54–55, 56, 18 O.O.3d at 34–35, 35–36, 410 N.E.2d at 1257–1259, 1259. In so holding, the court relied upon the fact that investigatory and adjudicatory powers were vested in the same person, not just the same agency, that the ordinances did not provide for the appointment of a referee (now magistrate) or examiner to conduct hearings, as is provided for in the Ohio Administrative Procedures Act, R.C. Chapter 119, and that, in its view, the newly created agency involved in the administrative proceeding had had an "incentive to convict" to prove its worth to the legislature. *Id.* at 55–56, 18 O.O.3d at 35–36, 410 N.E.2d at 1258–1259.

We note that, in the twenty years since the *Burke* decision, no other court has relied on that case in finding that an R.C. Chapter 2506 appeal was inadequate to ensure one's due process rights. Moreover, unlike the Toledo ordinances at issue in *Burke*, the Dayton ordinances provide for the appointment of independent hearing examiners so that the DHRC's investigatory and adjudicatory functions are not performed by the same person. Further, there is no reason to suspect that the DHRC had an untoward incentive to find a violation of the city's discrimination ordinances. For these reasons, we decline to follow *Burke* in this case. Under the totality of the circumstances, we find no due process violation.

We also note that the challenged ordinances have existed in their current form for almost thirty years. Long acquiescence in the constitutionality of a statute by the bench and bar is in itself a recognition of its constitutionality, and courts must not readily disturb a statute by holding it invalid after such acquiescence. 16 Ohio Jurisprudence 3d (1979), Constitutional Law, Section 150. The fact that the constitutionality of R.C.G.O. 32.16 and 32.20 has not been challenged over a period of time tends to show that these ordinances, including the judicial powers delegated therein, do not infringe upon the judicial authority reserved to the courts by the Ohio Constitution.

The first assignment of error is overruled.

*Judgment affirmed.*

FAIN and GRADY, JJ., concur.