{¶ 1} Plaintiff-appellant, Nancy Valentine, appeals from a judgment of the Cuyahoga County Court of Common Pleas granting summary judgment to defendants-appellees, Westshore Primary Care Associates, Inc. ("Westshore"), Nancy Lempke, Michelle Klobusnik, and Helen Ginther. For the following reasons, we affirm.
 {¶ 2} On November 24, 2004, Valentine filed a complaint for damages against appellees for race discrimination, retaliation, wrongful discharge in violation of public policy, civil conspiracy, intentional infliction of emotional distress, and defamation. Valentine alleged that she was an African American, was employed by Westshore, and that she was terminated because of her race. She also alleged that appellees retaliated against her by making false and/or misleading reports about her.
 {¶ 3} According to the complaint, appellees refused to grant the same pay raises to her that were given to similarly situated Caucasian employees; treated her disparately with regard to the terms and conditions of her work compared to similarly situated Caucasian employees; and when she was terminated, she was replaced by a Caucasian individual.
 {¶ 4} Westshore hired Valentine as a "biller/coder" on February 15, 2002, on the recommendation of Dr. James Ohliger. Dr. Ohliger had relocated his practice to Westshore in February 2002, and Valentine had worked with him at his previous practice. Valentine testified in her deposition that she was interviewed by Michelle Klobusnik, the practice manager, but that she also met with Nancy Lempke, her supervisor, on the day of her interview. Valentine began her employment at Westshore on February 26, 2002. She was terminated on September 16, 2002. *Page 3 
 {¶ 5} Lempke, who became the supervisor of the billing department on February 15, 2002, stated that when Valentine first started, she thought she had a "good knowledge of billing" and that she was helpful to others. Lempke said her opinion of Valentine changed sometime around the end of July or beginning of August. She said Valentine "wasn't as effective in her work as we had hoped." She stated that Valentine's production was low and her hours were irregular. She explained that Valentine wanted to come in on the weekends or come in very early, when other people were not there. Lempke said she thought that "might be the reason for the low productivity."
 {¶ 6} Lempke further testified that she thought Valentine's attitude had changed; Valentine became "less professional, less conscientious." She said that when Valentine first started, she dressed professionally. But "as time went on," Valentine would wear tee shirts and jeans, when no one wore jeans. But Lempke did not know if it had been written in any policy that employees could not wear jeans.
 {¶ 7} Valentine explained that the "friction" in the billing department started "a couple of weeks prior to [her] being terminated." According to Valentine, it began when Lempke left a note on her time card that said she could not work overtime anymore. Prior to that, Lempke had told her that she could work as much overtime as she wanted. Valentine called another employee to ask her if she had received the note, and the employee told her no. Valentine said she was very angry with Lempke, but denied that she had ever threatened her with violence in any way. Valentine agreed that Lempke, as her supervisor, had the authority to change the overtime policy. *Page 4 
 {¶ 8} Lempke documented the incident in an August 12, 2002 "Human Resource Employee Report." Lempke reported to Helen Ginther:
 {¶ 9} "* * * Nancy Valentine asked if she could speak with me in private. * * * She came in closed the door and threw a paper that I had given her (letting her know I needed O.T. approval) onto my desk she said it was bullshit and that I couldn't treat her like the other idiots in the department. She said I told her she could work O.T. anytime she wanted. I apologized if I misled her and that from now on she needs to check with me before she works overtime. She asked why she's the only one who needs this. I told her it was done on an individual basis. She told me how much she dislikes me and the way I treat other employees in the department. She said I play games only to benefit myself and that she will not put up with this bullshit and that I'm getting rid of her or want to get rid that I better be prepared to [copy of document cut off here] I have never brought up her leaving and that if she wasn't happy here that was her decision. She became extremely upset and was going on loudly about many things, I couldn't make it all out. I asked her how she wanted me to resolve her problem or situation and she never made that clear. She never made any suggestion on how she felt the situation could be resolved. She just left the office and didn't speak to me again."
 {¶ 10} Lempke testified that she did not know if Valentine was ever shown this document or ever had a chance to comment on it. Valentine said that she was never given the opportunity to comment on any complaint about her.
 {¶ 11} Lempke stated that employees were supposed to get approval before they worked overtime. If they did not get approval, they would be "reminded" that they needed to *Page 5 
get permission next time. Lempke said she wrote the "Human Resource Employee Report" on August 12, 2002 because she wanted to document the incident.
 {¶ 12} Lempke said when Valentine came in her office that day, she shut the door, threw a paper at her, and began yelling at her. Lempke said she felt uncomfortable and afraid. Prior to this, Lempke said that she had known about Valentine's "history of violent behavior," and "this sort of culminated [her] fears." She agreed, however, that she did not know of any other "history of violence" Valentine had besides the incident at her son's basketball game.[1] When asked why she did not put in the report that Valentine had threatened her, she did not know why, but said that she "might have been afraid to do it."
 {¶ 13} With respect to time-clock usage, Valentine stated that when she was hired, she understood the time-clock policy to be "[w]hen you come in, you swipe; when you go out, you swipe." She agreed that included breaks. She did not recall Lempke ever formally telling her that there was a problem with her time cards. She did say that Lempke joked with her about it a few times.
 {¶ 14} Lempke explained that the policy in the department was that employees had to clock out to take a smoke break, and clock back in when they returned. She said it was a "liberal policy unless it was noticed that people were taking advantage of it." She said that Valentine and "Janet" began taking advantage of it. *Page 6 
 {¶ 15} When Lempke was asked if she always clocked in and out, she stated, "I'm sure I didn't always clock in and out. Sometimes I would forget." When shown a "Record of Verbal Warning" about her own time-clock misuse on August 1, 2002, Lempke said that she had never seen the document.
 {¶ 16} Lempke stated that she never formally wrote Valentine up for time-clock misuse, but did speak with Valentine about it and documented the discussion for the Human Resource file. The record shows that Lempke filled out a "Record of Verbal Warning" on May 2, and August 29, 2002, documenting Valentine's time-clock misuse. The August 29, 2002 record had a post-it note attached to the bottom from Helen Ginther, the human resource manager, telling Lempke that Valentine needed a verbal warning about "clocking." Lempke said that Ginther "kept track of the swipes and the time-clock."
 {¶ 17} Lempke then identified several time-clock reports. She randomly chose eight days from approximately 400 time-clock records and reviewed them. She did not find Valentine's time records to be any different from the other employees on any of the days. She identified the time-clock reports from May 1, 2002, and August 27, 2002 (days that were immediately before Valentine received a verbal warning from Lempke). She agreed that there was nothing unusual about Valentine's clocking in and clocking out on those days, compared to the other seven employees on the list.
 {¶ 18} With respect to Valentine's allegations that she was treated disparately because she did not receive an annual review and did not get a pay raise, Valentine claims that when she was hired, she was told that she would receive a review after 90 days and an annual raise. *Page 7 
When showed an "Employee/Management Pre-employment Check-off List," Valentine agreed that on her day of hire, she initialed a line that said, "Annual salary review in July (not necessarily a raise)."
 {¶ 19} Lempke explained that employees are generally evaluated in July and receive a merit raise if appropriate. Westshore's employee handbook states that "once each year, generally in January or July," each employee will receive a performance review. Lempke agreed that everyone in the department, except Valentine, received a raise in August 2002. She also agreed that Valentine did not receive a performance review.
 {¶ 20} Lempke explained that Valentine was never given an evaluation because she had not been there for a full year. She said that was Westshore's policy. She said that Valentine was not given a 90-day evaluation because Westshore did not conduct 90-day evaluations at that time, but it does now. Westshore's manual did not provide for a 90-day evaluation when Valentine worked there.
 {¶ 21} Klobusnik testified that she believed that the line on the "Pre-employment Check-off List," that said "Annual Salary Review in July (not necessarily pay raise)," meant that Valentine would receive an annual review in July 2002. When asked if it would surprise her if Valentine was the only one in the department who had not received a performance review, Klobusnik said it would, but that it would not surprise her if Valentine was the only one who did not receive a raise. Because she explained that Valentine was brought in at a higher rate of pay "than all of the other billers." *Page 8 
 {¶ 22} Helen Ginther, the human resource manager, also testified that she thought Valentine should have gotten a 90-day performance review, but said they are not always done. Ginther also said that Valentine was not entitled to a raise in August 2002 because she was hired in at a higher rate of pay.
 {¶ 23} Lempke explained that in a September 9, 2002 "Human Resource Employee Report," she documented her fear of Valentine. In it, she wrote:
 {¶ 24} "I just wanted to document that I am very uncomfortable with Nancy Valentine's behavior. She has made it clear that she does not like me and would prefer not to have to report to me. I have knowledge, given to me by Nancy Valentine herself, that she has a history of violence. She was charged in court and has been in court several times to answer these charges. I just wanted this on the record."
 {¶ 25} Klobusnik testified that she discussed productivity problems with Valentine. Klobusnik identified a document that she typed, which stated:
 {¶ 26} "Notes from meeting with Nancy Valentine Sept. 10, 2002
 {¶ 27} "Nancy had complaints regarding Nancy Lempke, her supervisor. Nancy V. spent considerable time discussing personal complaints, i.e., the time Nancy L. comes into the office, distribution of work, relationship with other employees etc. I told Nancy V. that Nancy L. is her supervisor, therefore she needs to follow her instructions. She need not have a friendly relationship with her either in or out of the office. Nancy V. said `just keep her away from me.' I told Nancy V. that that was not an appropriate response. I needed her to *Page 9 
work effectively with her supervisor. Nancy also stated that she purposely left billing at the end of Aug. just to spite Nancy L."
 {¶ 28} Klobusnik said that she recalled that Valentine had purposefully wanted to reflect badly on Lempke. Valentine remembered the meeting with Klobusnik. But Valentine denied that she said "just keep her away from me," and did not recall Klobusnik telling her that her response was not appropriate. Valentine also denied that she had ever said that she purposefully left billing at the end of August. Valentine said Klobusnik made it up.
 {¶ 29} Valentine testified that in addition to telling her "concerns" about Lempke to Klobusnik, she also told Ginther and Dr. Ohliger.
 {¶ 30} In his deposition, Dr. Ohliger said that he treated Valentine as a patient, but without his notes, he could not recall what he treated her for. He stated that he did remember Valentine telling him that she was having some difficulty at work, but he could not recall the details of the conversation.
 {¶ 31} Lempke identified another "Human Resource Employee Report" from September 11, 2002. In it, Lempke had written:
 {¶ 32} "Nancy Valentine has been out of the office since September 3rd. She called on Monday to let us know she hurt her foot, she would not be able to work until after she saw Dr. Ohliger on Wednesday 9-11-02. She said she needed clearance from a doctor to return to work. I told her I hope she felt better and thank you for calling. She called again at 11:10 on 9-11-02. Brenda and Carla were in my office at the time. She said she was seeing Dr. Ohliger at 2:00 p.m. today and would be in Thursday at 4:30 and wanted to make sure I put *Page 10 
hospital charges on her desk. I told her that there were EKG's and she could do packs. She said she didn't want to waste her time with those when there [are] hospital charges. I told her that the EKG's and packs needed in. She asked, well who's doing the hospital[?] I told her that we were working on system for that. She was upset and abruptly got off the phone."
 {¶ 33} Lempke said she wrote it because she wanted to document that Valentine did not want to do work that had been assigned to her. But she agreed that she did not know if Valentine would have actually done the work.
 {¶ 34} Klobusnik testified that she and Dr. Dobrovich made the decision to terminate Valentine, but said that Ginther may have been in on the decision. Valentine had been off work since September 3, 2002. When she came back to work on September 16, they terminated her.
 {¶ 35} Valentine explained that at the end of her day on September 16, Ginther approached her. Ginther said she needed to talk to her. Lempke and Klobusnik were also there. Valentine said that she was told that they were terminating her and they gave her an "Employee Warning Report." The report was signed by Ginther and indicated that Valentine's "violation[s]" were "threatening or engaging in violence," and "insubordination." Under "employee's statement," Valentine wrote, "I disagree with all. Never had a verbal or oral warning." Valentine said she told them that she would "see them in court."
 {¶ 36} Ginther stated that she investigated the complaints that Lempke had made against Valentine, but admitted that she never asked Valentine her side of the story. Ginther agreed that there are "two sides to every story," and that she was thankful that she had the *Page 11 
opportunity to explain her side of the story when there were complaints about her from a patient and from another employee.
 {¶ 37} Lempke explained that Deborah Carey, a Caucasian, was hired after Valentine, but she did not replace Valentine. Lempke said that Carey was hired as a customer service representative; she did not do "charge entry." Lempke agreed that Carey got a mid-term raise in August 2003, despite the fact that she had not been there for one year.
 {¶ 38} Lempke identified a list of billing department employees that were hired after Valentine was terminated. It included Deborah Carey, hired on November 4, 2002; Brenda Rudolph, hired on March 22, 2004, and Darlene Riggle, hired on January 4, 2005. Lempke said that Rudolph is the only one who does "charge entry on a regular basis." She explained that Carla Heun "picked up the added responsibility of hospital billing" after Valentine left.
 {¶ 39} Gail Steagall testified that she had worked with Valentine in the billing department. She found Valentine to be professional, and said Valentine dressed professionally. They were able to dress casually at work.
 {¶ 40} Steagall only recalled one time where she witnessed Valentine behave non-prof essionally. She described the incident where Valentine had received the memo from Nancy Lempke that said, "no more overtime unless it's approved." Steagall said that she and Mary Ellen Cadle tried to calm Valentine down before Lempke "came in because she was talking in a threatening manner." Steagall explained that Valentine "wanted to physically harm" Lempke, but she could not remember exactly what Valentine had said that day. Steagall described Valentine's tone as angry and said "she even called another girl [Sandra *Page 12 
Sweet] at home and asked her if she had gotten the memo." Steagall said that she did not receive the memo regarding overtime, but that Lempke had told the department about the policy "verbally the night before." At that time, Valentine had already gone home.
 {¶ 41} Steagall testified that she never reported the physical threat to anyone because "[t]here was no one to report it to." She said she did not tell Lempke at that time because as soon as Lempke came in that day, Valentine had a conversation with her. She admitted that she did not tell Lempke about the threat of violence until after Valentine was terminated.
 {¶ 42} Steagall said she did talk to Mary Ellen about it, and they both agreed that Valentine wanted to harm Lempke. However, she did not report it to anyone, tell security, or call the police.
 {¶ 43} Steagall testified that she observed Valentine sleeping at work one time, but that she never told Lempke until after she was terminated. Steagall said that she also observed Lempke take cigarette breaks without clocking out.
 {¶ 44} Steagall said that Carla Heun took over Valentine's responsibilities when Valentine was terminated.
 {¶ 45} Mary Ellen Cadle testified that she sat beside Valentine in the billing department. She thought that Valentine was professional at first, but then she "got too comfortable in the position." She noticed that it took Valentine longer to "put in charges." She said that Valentine would "doze off and she would throw "stuff at her to wake her up * * * so she wouldn't get caught by [Klobusnik]." She said this happened "maybe three times *Page 13 
a week." She never reported this to anyone until "the lawyer asked us to write down * * * what we saw." She said that she heard Valentine snoring two times.
 {¶ 46} Cadle did not believe Valentine dressed professionally because she wore jeans and tee shirts. Cadle said that they were only allowed to wear jeans on Fridays, but did not know if that was a written policy.
 {¶ 47} Cadle said that she observed "hostile" and "threatening" behavior by Valentine one time. She said Lempke had left a note on Valentine's desk. Cadle said that Valentine threatened to harm Lempke if Lempke "walked through the door at that time." Specifically, Cadle remembered Valentine saying, "[s]he was going to kick [Lempke's] ass."
 {¶ 48} Cadle said that she did not get the same memo as Valentine because Lempke "told us verbally the day before I was there[,]" but Valentine was not. Cadle took Valentine's threats "very serious." She said Valentine was very upset about this for "a good two hours."
 {¶ 49} Cadle explained that she did not report this to anyone because "I do not tell on other co-workers, and [Valentine] was calmed down." She believed that if Lempke had come into work at that time, Valentine would have harmed her. But by the time Lempke came in, Valentine had calmed down. She did not report this incident until Helen Ginther "asked us to write down what we saw." This was after Valentine "was long gone."
 {¶ 50} Cadle said that she did not report it or call the police, even though she saw Valentine go into Lempke's office later that day, and she heard the two of them yelling. She *Page 14 
said that she told Valentine to talk to Klobusnik or Dr. Dobrovich, but that if she was going to harm Lempke, "don't do it during office hours."
 {¶ 51} Appellees moved for summary judgment, maintaining that Valentine did not establish a prima facie case of discrimination; Westshore had a legitimate, non-discriminatory reason for the termination; i.e., that she was terminated for insubordination and threatening or engaging in violence; and that Valentine did not show that its legitimate, non-discriminatory reason was a mere pretext.
 {¶ 52} The trial court granted appellees' motion for summary judgment on all counts[2] It is from this judgment that Valentine appeals, raising four assignments of error for our review:
 {¶ 53} "[1.] The trial court erred by requiring plaintiff to establish her case by a preponderance of the evidence to defeat defendants' summary judgment motion, when plaintiff needed only to demonstrate the existence of genuine issues of material fact.
 {¶ 54} "[2.] The trial court erred by employing the `same actor' inference against plaintiff when other reasonable inferences from the same evidence could have been drawn in plaintiffs favor, because for summary judgment purposes all reasonable inferences are required to be made in the light most favorable to the non-moving party. *Page 15 
 {¶ 55} "[3.] The trial court erroneously found that plaintiff did no more than offer her own belief that defendants' proffered excuse for its discriminatory conduct was untrue, when plaintiff set forth specific facts showing that there were genuine issues for trial.
 {¶ 56} "[4.] The trial court erroneously found that plaintiff's complaints of discriminatory treatment were too vague to `invoke the protection of the law' to support a claim for retaliation."
 {¶ 57} Valentine's first three assignments of error address whether the trial court properly granted summary judgment on the issue of race discrimination. Since these assignments are interrelated, and since we afford no deference to the trial court's decision when reviewing a summary judgment motion, we will address them concomitantly.
 SUMMARY JUDGMENT STANDARD {¶ 58} We review an appeal from summary judgment under a de novo standard. Baiko v. Mays (2000), 140 Ohio App.3d 1, 10. Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.Northeast Ohio Apartment Assn. v. Cuyahoga Cty. Bd. of Comm. (1997),121 Ohio App.3d 188, 192. Civ. R. 56(C) provides that before summary judgment may be granted, a court must determine that "(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is *Page 16 
adverse to the nonmoving party." State ex rel. Duganitz v. Ohio AdultParole Auth. (1996), 77 Ohio St.3d 190, 191.
 {¶ 59} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-293. If the movant fails to meet this burden, summary judgment is not appropriate, but if the movant does meet this burden, summary judgment will be appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. Id. at 293.
 OHIO CIVIL RIGHTS ACT {¶ 60} Valentine brought her race discrimination claim pursuant to Ohio civil rights law, which is set forth in Chapter 4112 of the Ohio Revised Code. The Ohio Supreme Court has held that discrimination cases brought in state courts should be construed and decided in accordance with federal guidelines and requirements. Barker v. Scovill, Inc.
(1983), 6 Ohio St.3d 146, 147.
 {¶ 61} R.C. 4112.02(A) provides that "it shall be an unlawful discriminatory practice * * * for any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 McDONNELL DOUGLAS/BURDINE FRAMEWORK *Page 17 {¶ 62} Because discrimination is seldom evidenced by overt actions or direct evidence, an employee may raise a presumption of discrimination through circumstantial evidence. The analytical framework for proving discrimination based on circumstantial evidence was set forth inMcDonnell Douglas Corp. v. Green (1973), 411 U.S. 792. This framework was adopted by the Ohio Supreme Court in Plumbers Steamfitters Commt.v. Ohio Civil Rights Comm. (1981), 66 Ohio St.2d 192. Barker, supra, at147; Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, 504.
A. Prima Facie Case
 {¶ 63} Under this basic framework, employees must establish a prima facie case of discrimination. In order to do so, they must show that (1) they were a member of a statutorily-protected class; (2) they suffered an adverse employment action (3) they were qualified for the position; and (4) that they were replaced by a person who is not a member of the protected class or that similarly situated, non-protected employees were treated more favorably. Barker, supra, paragraph one of the syllabus. See, also, Smith v. Goodwill Indus. of Miami Valley, Inc. (1998),130 Ohio App.3d 437, 443.
 {¶ 64} In Williams v. Akron, 107 Ohio St.3d 203, 2005-Ohio-6268, at ___11, the Ohio Supreme Court explained:
 {¶ 65} "Establishing a prima facie case `creates a presumption that the employer unlawfully discriminated against the employee.' Texas Dept.of Community Affairs v. Burdine (1981), 450 U.S. 248, 254. `If the trier of fact believes plaintiffs evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the *Page 18 
plaintiff because no issue of fact remains in the case.' Id.; see, also,St. Mary's Honor Ctr. v. Hicks (1993), 509 U.S. 502, 506, quoting 1 D. Louisell C. Mueller, Federal Evidence (1977) 536, Section 67."
B. Employer's Burden of Production
 {¶ 66} If the employee establishes a prima facie case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. Burdine, supra, at 254.
 {¶ 67} "If the employer submits admissible evidence that `taken astrue, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has met its burden of production. (Emphasis sic.) St. Mary's at 509. At this point, the presumption created by the prima facie case drops from the case because the employer's evidence has rebutted the presumption of discrimination.[St. Mary's] at 510." Williams, supra, at ___12.
 {¶ 68} However, "if the employer fails to meet its burden of production and `reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a prima facie case,' then the question of whether the employer discriminated must be decided by the fact finder. (Emphasis sic.) [St. Mary's] at 509-510."Williams at ___13.
 {¶ 69} The "ultimate burden" of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the employee. Burdine at 253.
 C. Pretext *Page 19 
 {¶ 70} Finally, if the employer advances legally sufficient grounds for the adverse action, then the burden shifts back to the employee to show by a preponderance of the evidence that the reasons articulated by the employer were merely a pretext for unlawful discrimination.Barker, supra, at 148. The employee "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, supra, at 256.
 {¶ 71} Thus, if an employee fails to set forth facts that establish a prima facie case of employment discrimination or to issue the evidentiary rejoinder to the asserted lawful basis for the adverse employment action, then the employee's claim must fail.
 APPLICATION OF ANALYTICAL FRAMEWORK {¶ 72} Valentine raises six different claims of discrimination. She alleges that she was treated disparately regarding: 1.) time-clock usage; 2.) overtime; 3.) performance reviews; 4.) pay raises; 5.) allegations of unprofessional conduct; and 6.) the manner in which We stshore followed its own policies. We must determine if Valentine established a prima facie case for each of these claims, or at least raised genuine issues of material fact regarding each of them.
A. Prima Facie Case of Discrimination
 {¶ 73} There is no question that Valentine, as an African American, is a member of a statutorily protected class, and thus, meets the first element of a prima facie case of discrimination as a matter of law on this element. *Page 20 
 {¶ 74} In addition, Valentine also established that she was qualified for the job of biller/coder. She testified that she was hired to do hospital billing and that she also trained other persons in the billing department to do it. Lempke testified that she was happy with Valentine's work in the beginning, and that Valentine seemed to fill a gap they had in the department. Thus, it is clear that she could adequately perform the duties of the job.
 {¶ 75} Westshore claims that Valentine became unqualified because she failed to pass a coding certification test. But Westshore supervisors admitted that a "biller/coder" did not need to be certified to perform the job, nor was it a prerequisite for the job. Thus, no question of fact remains as to whether Valentine was qualified for the position. Valentine established the third element of a prima facie case of discrimination as a matter of law.
 {¶ 76} This court will now address the remaining two elements of a prima facie case separately for each area of discrimination alleged.
(1) Time-clock Usage and Overtime
 {¶ 77} Valentine claims that she was disparately treated with respect to misuse of the time-clock policy and overtime. However, Valentine failed to establish a genuine issue of material fact as to how she suffered an adverse employment action regarding these two conditions of employment. She was not fired for these violations, or even formally disciplined.
 {¶ 78} An adverse employment action is defined as a "materially adverse change in the terms and conditions of [plaintiff s] employment."Hollins v. Atlantic Co., (C.A.6, 1999), 188 F.3d 652, 662. Examples of adverse employment actions include firing, failing to *Page 21 
promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation. Burlington Indus., Inc. v. Ellerth (1998),524 U.S. 742, 761.
 {¶ 79} There is no dispute that Valentine is the only employee from the billing department who received a written memo from Lempke, informing her that she needed to get prior approval before working overtime. We agree the denial of overtime or material decrease in overtime compensation can constitute an adverse employment action, but it must result in economic harm to the employee. See Burlington
(associating "tangible employment action[s]" with "direct economic harm"). Valentine does not present any facts that she was ever denied overtime or that her overtime compensation decreased significantly. Thus, we do not find that she suffered an adverse employment action relating to overtime.
 {¶ 80} Regarding time-clock usage, Valentine established that she received several verbal warnings from her supervisor regarding her misuse of the time-clock policy. Nonetheless, she does not point to any evidence which raises a genuine issue of material fact as to how this adversely affected her employment.
 {¶ 81} "A written warning may be an adverse employment action only if it affects a significant change in the plaintiffs employment status."Haynes v. Level 3 Commc'ns, LLC (C.A.10, 2006), 456 F.3d 1215, 1224. Likewise, verbal reprimands do not qualify as adverse actions unless there is evidence they affected the employee's job status. Sanchez v.Denver Pub. Schs. (C.A.10, 1998), 164 F.3d 527, 533. Valentine's employment status was not *Page 22 
affected in any way when she received verbal warnings from Lempke about her time-clock usage.
 {¶ 82} Having failed to establish genuine issues of material fact as to the second element of a prima facie case of discrimination regarding time-clock usage and overtime, we conclude that summary judgment as to these two claims was proper.
(2) Allegations of Unprofessional Conduct
 {¶ 83} Valentine claims that Westshore treated her disparately regarding its handling of allegations of unprofessional conduct against her. She argues that she was terminated, while similarly situated, non-protected employees were not. There is no dispute that Westshore terminated Valentine for insubordination and threatening behavior (the "unprofessional conduct" Valentine refers to in her argument). Termination is the most severe adverse employment action. Accordingly, Valentine established as a matter of law that she suffered an adverse employment action regarding this claim.
 {¶ 84} However, as far as establishing the fourth element, that she was either replaced by a person in a non-protected class or that non-protected, similarly situated persons were treated more favorably, we find that Valentine did not raise a genuine issue of material fact as to this element.
 {¶ 85} Valentine claims that Westshore "replaced" her by "assigning her job functions to a Caucasian worker," and that "shortly thereafter, [Westshore] hired additional Caucasian staff members to engage in other office functions previously handled by [her]." We disagree that the record establishes either of these claims. *Page 23 
 {¶ 86} First, Valentine was not replaced by a person in a non-protected class. Lempke, Klobusnik, Steagall, and Cadle all testified in their depositions that Carla Heun took over or assumed Valentine's responsibilities. Assumption of duties does not constitute replacement. Grosjean v. First Energy Corp. (C.A.6, 2003), 349 F.3d 332,335-336. "A `person is not replaced when another employee is assigned to perform the plaintiffs duties in addition to other duties * * *. A person is replaced only when another employee is hired or reassigned to perform the plaintiffs duties.'" Id., quoting Barnes v. GenCorp Inc. (C.A.6, 1990), 896 F.3d 1457, 1465. See, also, Mendlovic v. Life Line Screeningof Am., Ltd., 173 Ohio App.3d 46, 2007-Ohio-4674.
 {¶ 87} Valentine established that Westshore hired three people in the billing department after she was terminated (on September 16, 2002); Deborah Carey on November 4, 2002; Brenda Rudolph on March 22, 2004, and Darlene Riggle on January 4, 2005. But she did not put forth any evidence establishing that these three people replaced her. Lempke and Klobusnik testified that Carey was not hired as a biller/coder, but as a customer service representative. And Rudolph and Riggle were certainly not hired "shortly" after Valentine was fired. Although Rudolph did handle billing, we cannot conclude that someone hired almost a year and half after someone else was terminated, raises an inference that the person "replaced" the other.
 {¶ 88} Valentine further alleges that Helen Ginther, a Caucasian, "in contrast" to how she was treated, "had a record of multiple incidents of unprofessional conduct for which she never suffered negative consequences." She claims that Ginther "was written up for *Page 24 
violating rules related to confidentiality, rude treatment toward a patient, `slapping' a coworker's hands, and throwing a pen at a coworker." (Emphasis sic.) Valentine claims that Ginther never suffered a negative employment action, but instead was promoted (to human resource manager).
 {¶ 89} The law is clear that in order for this element to be successfully established, the parties to be compared must be similarly-situated in all respects; that is, they "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Atkinson v. Akron Bd. of Edn., 9th Dist. No. 22805, 2006-Ohio-1032, ___28, citing Mitchell v. Toledo Hosp. (C.A. 6, 1992), 964 F.2d 577, 583. Employees are not similarly situated in all relevant respects if there is a meaningful distinction between them which explains the employer's treatment of them. Koski v. WillowwoodCare Ctr. of Brunswick, Inc., 158 Ohio App.3d 248, 2004-Ohio-2668, ___17, citing Ercegovich v. Goodyear Tire Rubber Co. (C.A. 6, 1998),154 F.3d 344, 353.
 {¶ 90} After reviewing the record, we conclude that Valentine did not establish a genuine issue of material fact as to a similarly situated, non-protected employee being treated more favorably. Ginther was not similarly situated in all relevant respects. Ginther did not have the same supervisor, did not work in the same department, had been employed by Westshore since 1997, and at the time of Ginther's infractions (2001), she was actually the site manager for Westshore's North Ridgeville office. *Page 25 
 {¶ 91} Thus, Valentine fails to establish genuine issues of material fact regarding the fourth element of a prima facie case of discrimination regarding her claims of disparate discipline for alleged unprofessional conduct. Summary judgment was proper on this claim.
(3) Westshore's Policies
 {¶ 92} Valentine claims that Westshore treated her disparately by not following six "specific polices" when it applied them to her, but that it did when it applied the policies to similarly situated, non-protected employees. The policies are: (1) when she reported the alleged incident of harassment out to her supervisor, and other members of management, the complaint was not investigated; (2) complaints will be investigated; (3) employees will receive an annual review in January or July; (4) "Employee Warning Reports" will contain a statement of fact describing the current misconduct, and also refer to past warnings issued for the same or similar conduct; (5) if an employee receives three written "Employee Warning Reports," the employee could be suspended; and (6) all reports of work-related threats will be investigated.
 {¶ 93} Valentine claims that Westshore applied these policies to non-protected employees, but did not afford her the same. Valentine establishes that she suffered an adverse employment action since, as she argues, she was "summarily terminated" without having the benefit of these polices.
 {¶ 94} However, Valentine runs into the same problem that she did regarding her claim of Westshore's disparate treatment in handling allegations of unprofessional conduct. Besides annual performance reviews (where she did establish that non-protected persons *Page 26 
were treated more favorably), she does not show that she was replaced by a non-protected person, or show how Westshore treated similarly situated non-protected employees more favorably. Accordingly, Valentine fails to establish a genuine issue of material fact regarding the fourth element of a prima facie case of discrimination on the issue of disparate treatment of Westshore not following its policies. Summary judgment was proper on this claim.
(4) Performance Review and Pay Raise
 {¶ 95} Since a pay raise can result from a positive annual performance review, and thus, lack of one can result in an adverse employment action (no raise), we will address these two claims in tandem. Valentine claims that she was treated disparately because she was the only employee in the department who did not receive an annual review and pay raise in July and August 2002.
 {¶ 96} Lempke, Klobusnik, and Ginther all agreed in their depositions that Valentine was the only employee in the department who did not receive a pay raise that year. In addition, documents attached to Valentine's response to Westshore's summary judgment motion verify that Valentine was the only employee in the billing department who did not receive a pay raise in August 2002. It is undisputed that there were non-protected, similarly situated employees in the billing department.
 {¶ 97} Thus, this establishes the second and fourth elements of a prima facie case as a matter of law. Valentine clearly suffered an adverse employment action by not receiving an annual performance review and pay raise in August 2002 and non-protected, similarly situated persons did receive them. *Page 27 
B. Westshore's Burden of Production
 {¶ 98} Valentine's only remaining claim (where she established a prima facie case) is that she was disparately treated with respect to annual performance reviews and pay raises. Thus, we must determine if Westshore met its burden of setting forth evidence of a legitimate, non-discriminatory reason for not reviewing Valentine's performance in July 2002, and not giving her a pay raise.
 {¶ 99} Westshore claims that Valentine did not get an annual performance review in July 2002 because Valentine had only worked in the department since February 2002. Westshore further maintains that Valentine did not receive a raise because she was hired "in at a higher wage than the existing billers/coders."
 {¶ 100} Westshore's personnel records show the following:

Employee Hire Date Starting Salary Pay Increase in 8/02
Nancy Lempke 11/6/2000 unclear, but was making $17.00
 $13.91 when Valentine
 started
Gail Steagall prior to 2001 unclear, but was making $13.50
 $12.75/hr when Valentine
 started
Janet Tucker prior to 2001 unclear, but making $11.31 $12.06 in 8/02
 when Valentine started
Kelly Runyon prior to 2001 unclear, but making $10.50 $11.07 in 8/02
 when Valentine started
Mary Ellen Cadle 3/26/01 $13.00/hr $13.50 in 1/02
 $15.00 in 8/02
Brenda Stakolich 6/27/01 $10.00/hr $12.00 in 3/02
 *Page 28 
Carla Heun 6/21/01 $12.25/hr $14.00 in 7/02
 $15.00 in 8/02
Sandra Sweet 2/11/02 $13.00/hr $13.75 in 8/02
Nancy Valentine 2/26/02 $14.00/hr No increase in 8/02
Deborah Carey (hired
after Valentine was
terminated) 11/6/02 $11.25/hr $12.25 in 8/03

 {¶ 101} This evidence was sufficient to satisfy Westshore's burden of articulating a legitimate non-discriminatory reason for not affording Valentine an annual review in July 2002 and pay raise in August 2002.
C. Valentine's Burden of Showing Mere Pretext
 {¶ 102} In support of her argument that Westshore's reasons for not giving her an annual review or pay raise were a mere pretext, Valentine states only that "the undisputed facts as identified in the chart above belie this assertion." She concedes that she was hired in at a "comparable rate," but argues that "after Westshore gave raises to everyone in the department except her, [her] wage was less than the wage paid to the majority of department members."
 {¶ 103} After independently reviewing the record, we conclude that Valentine did not raise genuine issues of material fact as to pretext.
 {¶ 104} The record is clear that when Valentine was hired in February 2002, she was making more per hour than any other employee in the billing department, including *Page 29 
Lempke, who was the supervisor of the department. After the August 2002 pay raise, Valentine was still making more than the majority of the employees in the billing depart, except for Lempke (the supervisor), Cadle and Steagall, who had both been working at Westshore over a year longer than Valentine.
 {¶ 105} Moreover, Valentine was not the only African American who worked in the billing department. Sandra Sweet was hired approximately two weeks before Valentine. Westshore points out that although Sweet had not worked at Westshore for one year, she did receive a pay raise in August 2002 when the rest of the department did. Westshore explained that they gave her a raise to bring her more in line with the rest of the department. We note that she was still making less than Valentine was, even with a raise.
 {¶ 106} Accordingly, we conclude that the trial court properly granted summary judgment on each of Valentine's six claims of disparate treatment. Valentine's first three assignments of error are not well taken.
 RETALIATION CLAIM {¶ 107} In her fourth assignment of error, Valentine argues the trial court erred when it granted summary judgment on her retaliation claim.
 {¶ 108} Retaliation is prohibited by R.C. 4112.02(I):
 {¶ 109} "It shall be an unlawful discriminatory practice * * * [f] or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a *Page 30 
charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07
of the Revised Code."
 {¶ 110} In order to establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that she engaged in protected activity; (2) that the employer knew of her exercise of protected rights; (3) that she was the subject of adverse employment action; and (4) that there is a causal link between the protected activity and the adverse employment action. Balmer v. HCA, Inc. (C.A.6, 2005), 423 F.3d 606, 614.
 {¶ 111} Once an employee successfully establishes a prima facie case, it is the employer's burden to articulate a legitimate reason for its action. Id. If the employer meets its burden, the burden shifts back to the employee to show that the articulated reason was a pretext. Id.
 {¶ 112} In Coch v. GEM Indus., 6th Dist. No. L-04-1357,2005-Ohio-3045, the court explained:
 {¶ 113} "`In order to engage in a protected opposition activity * * * a plaintiff must make an overt stand against suspected illegal discriminatory action.' Comiskey v. Automotive Industry ActionGroup (E.D.Mich. 1999), 40 F.Supp.2d 877, 898; see, also, Jackson v.Champion Natl. Bank Trust Co. (Sept. 26, 2000), 10th Dist. No. 00AP-170, 2000 Ohio App. LEXIS 4390. Vague charges of discrimination do not invoke the protection of the law. [Booker v. Brown WilliamsonTobacco Co. (C.A. 6, 1989), 879 F.2d 1304,1313]. In addition, `complaints concerning unfair treatment in general which do not *Page 31 
specifically address discrimination are [likewise] insufficient to constitute protected activity.' Weaver v. Ohio State Univ. (S.D. Ohio 1998), 71 F.Supp.2d 789, 793-94."
 {¶ 114} Here, the record does not contain any evidence that Valentine specifically alleged discriminatory employment practices (i.e., engaged in a protected activity) to Westshore prior to her termination. SeeWilloughby v. Allstate Ins. Co. (C.A.6, 2004), 104 F. App. 528, 531 (rejecting claim that letter sent preceding retaliation constituted protected activity where letter made vague references to unhappiness among Caucasian employees); Barber v. CSX Distrib. Serv. (C.A.3, 1995),68 F.3d 694, 701-702 (holding that plaintiffs letter to Human Resources complaining about unfair treatment in general was not protected activity under the ADEA because letter did not specifically complain about age discrimination).
 {¶ 115} As evidence of a protected activity, Valentine points to her meeting with Lempke where she complained about being the only one who received the internal memo regarding overtime. But in her deposition, Valentine did not testify that she said anything to Lempke about being discriminated against because of her race. Nor did Valentine testify that she told Dr. Ohliger, Klobusnik, or Ginther that she felt she was being discriminated against because of her race. Instead, the record shows that she complained generally about not getting along with Lempke and told them her "concerns." But she did not testify that her "concerns" contained any allegations whatsoever of disparate treatment.
 {¶ 116} Accordingly, Valentine failed to establish that the first element of a claim of retaliation; i.e., that she engaged in a protected activity. Thus, the trial court *Page 32 
properly granted summary judgment on Valentine's retaliation claim. Valentine's fourth assignment of error is overruled.
 {¶ 117} Having found no merit to this appeal, we affirm the judgment of the Cuyahoga County Court of Common Pleas.
It is ordered that appellees recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, A.J., and MARY EILEEN KILBANE, J., CONCUR
[1] Valentine explained that while she was working at Westshore, she went to one of her son's basketball games. Someone made racial slurs at the game and she yelled back at the woman. Valentine pled guilty to an amended charge of disorderly conduct as a result of the incident. But Valentine said that no physical altercation had occurred.
[2] The only issues before this court are Valentine's race discrimination and retaliation claim. *Page 1