OPINION
{¶ 1} Kent Lookabaugh appeals from a judgment of the Clark County Court of Common Pleas, which granted the motions of Martin Spears and Southwest Landmark, Inc., for summary judgment. *Page 2 
 {¶ 2} The following facts appear to be undisputed.
 {¶ 3} Southwest Landmark, Inc. ("Landmark") is an agricultural cooperative, which is owned and governed by its members, all of whom are farmers in several counties in southwestern Ohio. The members constitute a substantial portion of the co-op's customers. Landmark's main business office is in Xenia, Ohio, but it operates a number of branch facilities throughout southwestern Ohio, including facilities in South Charleston and Catawba.
 {¶ 4} Martin Spears is a member and a substantial patron of Landmark. For many years, he has used the South Charleston facility for his grain marketing and farm supply needs. Spears is also a township trustee. Although Lookabaugh denied having any animosity toward Spears, the two men have not been friendly for many years. In June 1987, Spears purchased land from Lookabaugh, which was complicated by an unsatisfied lien on the property. After the purchase, Lookabaugh was a tenant of Spears. In November 1987, Spears attempted to evict Lookabaugh from the property. In subsequent years, Lookabaugh ran for township trustee, twice against Spears. In 1995, Lookabaugh filed a police report, alleging that Spears's son had stolen his campaign signs.
 {¶ 5} In July 2003, Lookabaugh spoke with Mike Taylor, a manager at Landmark's South Charleston facility, and expressed interest in working at Landmark. Lookabaugh's wife suffers from multiple sclerosis, and Lookabaugh was particularly interested in the health insurance benefits that Landmark provided. At that time, Lookabaugh had no health insurance. Taylor and Joe Fitzgerald, another manager, suggested to Doug Wical, the agronomy manager at the South Charleston branch, that he talk to Lookabaugh about an open position there.
 {¶ 6} In August 2003, Lookabaugh and Wical discussed employment at Landmark. *Page 3 
Wical offered Lookabaugh a job as a truck driver and applicator at an hourly rate of $12 per hour for forty hours per week. The job included health insurance, which was Lookabaugh's primary concern. Lookabaugh states that he was also assured that he would not be subject to seasonal layoffs. During August, Wical spoke with some of Landmark's customers about Lookabaugh. Although he learned that Spears and Lookabaugh did not like each other, Wical did not learn of any reason not to hire Lookabaugh. During that same time, Lookabaugh completed some projects for his home improvement business.
 {¶ 7} According to Lookabaugh, he began working at Landmark on August 29, 2003. In his deposition, he acknowledged that he was an at-will employee and that he had no contract or definite term of employment. He was happy to have the position with Landmark, because it permitted him to go home most days during lunchtime to check on his wife. Lookabaugh's home was approximately one-quarter mile from the South Charleston facility.
 {¶ 8} Lookabaugh claims that in early November 2003, after Spears won the election for township trustee, Spears complained to Landmark about Lookabaugh's employment at the South Charleston facility. Spears threatened to take his business elsewhere if Lookabaugh continued to work there, and he allegedly stated that he would convince other farmers to do the same. Wical told Lookabaugh that he had to leave. That same day, Wical — with the agreement of Gordon Wallace, the CEO of Landmark, and Terry Dyer, the manager of the Catawba facility — offered Lookabaugh a position at Landmark's Catawba facility, which was approximately fifteen miles away. Lookabaugh discussed the position with Dyer and Wallace and opted not to accept the position at Catawba. Lookabaugh claimed that the position was not comparable. Landmark, on the other hand, claimed that it offered Lookabaugh a comparable position at a *Page 4 
different location.
 {¶ 9} In January 2004, Lookabaugh brought suit against Spears, alleging that Spears had tortiously interfered with his business relationship with Landmark and that Spears' s actions constituted intentional infliction of emotional distress. Spears moved to dismiss Lookabaugh's complaint and sought sanctions against him. Based on the allegations in the complaint and evidence submitted by the parties, the trial court granted the motions. Lookabaugh appealed to this Court. In April 2005, we affirmed summary judgment on the intentional infliction of emotional distress claim, but reversed summary judgment in favor of Spears on Lookabaugh's tortious interference claim. Lookabaugh v.Spears, Clark App. No. 2004-CA-37, 2005-Ohio-1590. We found that "[t]here was a genuine issue of material fact as to whether Spears' actions in causing Landmark to transfer Lookabaugh amounted to a breach or termination of its business relationship with Lookabaugh." Id. at ¶ 24.
 {¶ 10} On remand, Lookabaugh filed an amended complaint, which added a claim against Landmark for wrongful discharge in violation of public policy, pursuant to Greeley v. Miami Valley Contractors,Inc.(1990), 49 Ohio. St.3d 228, 551 N.E.2d 981. After discovery, Spears and Landmark subsequently sought summary judgment on Lookabaugh's claims, which the trial court granted. The court held that Lookabaugh had not demonstrated that he was damaged by Spears's actions because the transfer to Catawba was to a comparable position and not unduly inconvenient. The court also concluded that Spears had a "conditional privilege to interfere with the business relationship between plaintiff and Southwest Landmark, Inc." The court thus found that both defendants were entitled to judgment as a matter of law.
 {¶ 11} Lookabaugh appeals the grants of summary judgment, raising three *Page 5 
assignments of error. To summarize, Lookabaugh's first assignment of error challenges the trial court's conclusion that his transfer was not a constructive discharge. His second assignment of error claims, in essence, that the trial court erred in concluding that Spears had a conditional privilege for his statements to Landmark. In his third assignment of error, Lookabaugh asserts that his discharge by Landmark was in violation of public policy. We find his first assignment of error to be dispositive, and we need not discuss his second and third assignments of error.
 {¶ 12} As an initial matter, we note that the parties have cited to the transcript of the evidentiary hearing held in June 2004. As we stated in our prior opinion, that hearing was not authorized by Civ.R. 56(C) and the court, in effect, held a bench trial, contrary to Lookabaugh's right to a jury trial. We did not consider the transcript of that hearing in our review of the trial court's July 2004 grant of summary judgment, and it is not proper evidence at this juncture. We, therefore, confine ourselves to consideration of the affidavits and deposition transcripts in the record.
 {¶ 13} Lookabaugh claims that the trial court erred in concluding that Lookabaugh "was not fired from the South Charleston facility but merely transferred to the Catawba facility approximately 10 to 15 miles away." Lookabaugh acknowledges that, if Landmark did not discharge him, his claims against Landmark and Spears both fail. Specifically, Lookabaugh would be unable to establish that Landmark terminated his employment — the underlying basis of a wrongful discharge claim — or that he suffered any damages as a result of Spears's alleged tortious conduct.
 {¶ 14} In order for a former employee to establish that he was constructively discharged, the employee must show that "the employer's actions made working *Page 6 
conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." Mauzy v. KellyServs., Inc., 75 Ohio St.3d 578, 588-89, 1996-Ohio-265, 664 N.E.2d 1272. The constructive discharge of an employee is, in the eyes of the law, the same as an employer's express termination of the employee.Powers v. Springfield City Schools (June 26, 1998), Clark App. No. 98-CA-10. It is not merely a form of discipline. Id.
 {¶ 15} Because Lookabaugh has asserted that the transfer to the Catawba branch constituted a constructive discharge, we find instructive the case law concerning whether a lateral transfer is adverse employment action for purposes of employment discrimination. A transfer without a change in benefits, salary, title, or work hours is usually not an adverse employment action. Policastro v. Northwest Airlines, Inc.
(C.A.6, 2002), 297 F.3d 535, 539.
 {¶ 16} An "adverse employment action" is conduct that results in a materially adverse change in the terms and conditions of employment.Keeton v. Flying J, Inc. (C.A.6, 2005), 429 F.3d 259, 262-263; Means v.Cuyahoga Cty. Dept. of Justice Affairs, Cuyahoga App. No. 87303,2006-Ohio-4123, ¶ 15. In general, an adverse employment action occurs when it results in a material change in wage or salary, a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or other indices that might be unique to the particular situation. Hollins v. Atlantic Co. (C.A.6, 1999), 188 F.3d 652, 662. A significant increase in the employee's commute may be a factor in whether a transfer is an adverse employment action. Keeton, 429 F.3d at 264-65.
 {¶ 17} In determining whether the transfer is an adverse employment action, *Page 7 
courts generally employ an objective test. See Mauzy,75 Ohio St.3d at 588-89; Policastro, 297 F.3d at 539, citing Kocsis v. Multi-Care Mgmt.,Inc. (C.A.6, 1996), 97 F.3d 876, 886. An employee's subjective belief that one position is more desirable is irrelevant to whether the transfer is an adverse employment action. E.g., Policastro,297 F.3d at 539; Tessmer v. Nationwide Life Ins. Co. (Sept. 30, 1999), Franklin App. No. 98AP-1278.
 {¶ 18} Lookabaugh offers three reasons why Landmark did not, in fact, offer him a transfer and instead terminated his employment: (1) there was no job available at Catawba, (2) the offered job was not comparable, and (3) Landmark was no longer the decision-maker regarding Lookabaugh's employment. Upon review of the record, we agree with the trial court that no genuine issue of material fact exists that Landmark transferred Lookabaugh to the Catawba facility and that Lookabaugh voluntarily chose not to accept that new position.
 {¶ 19} Lookabaugh contends that the transfer to Catawba was a "ghost job," because no job existed there. He states in his affidavit that there was no open position there; no one had left due to retirement, termination, or resignation; and no one was hired when he declined the transfer. Lookabaugh further asserts that the job at Catawba was not comparable to his position at South Charleston. He states in his affidavit that "Catawba was so situated that I could no longer check on my wife at lunchtime as I could when I worked at South Charleston." During his deposition, Lookabaugh expressed that his biggest concern was "that I was being sent there to be fired." He indicated in this affidavit that Catawa had a reputation for not keeping people very long. He also stated that Dyer had a reputation for being hot-tempered, *Page 8 
unpredictable, and an alcoholic. In short, Lookabaugh was uncomfortable working for Dyer. Lookabaugh also stated in his deposition that he did not take the position at Catawba because "Doug Wical and Mike Taylor and Terry Dyer could not guarantee me that Marty Spears would not have me removed from there." Finally, Lookabaugh stated that the Catawba facility was smaller than the South Charleston facility, and that he would be subject to layoffs.
 {¶ 20} Landmark, in contrast, asserts that it offered him a comparable position at Catawba. In his deposition, Wical stated that he came up with the idea to transfer Lookabaugh to a position at the Catawba facility in response to Spears and others' concerns about Lookabaugh. Prior to the transfer, Wical contacted Dyer about having Lookabaugh work there. Dyer informed Wical that he was willing to have Lookabaugh there. Wical testified that the position at Catawba would have been exactly the same as the position in South Charleston. Gordon Wallace also stated in his affidavit that, in consultation with Wical, Landmark decided to transfer Lookabaugh to the Catawba facility. Wallace reiterated that Lookabaugh's job duties were to be comparable to those he performed at South Charleston and that his compensation, including health insurance coverage, would not have changed. Although Lookabaugh states that Dyer indicated that his men are laid-off during the off-season, Dyer also told him that he finds work for them at other branches. Wallace states that Lookabaugh declined the transfer and voluntarily left his employment with Landmark.
 {¶ 21} Lookabaugh's evidence does not create a genuine issue of material fact as to the existence of the job position in Catawba or whether the job was comparable. Lookabaugh's assertions that no job existed and that he would have been fired shortly *Page 9 
after the transfer are speculative, at best. Lookabaugh acknowledged that he was assured that there was a comparable position at Catawba and that no one in management told him that he would be fired from that facility. Lookabaugh, however, did not report for work at Catawba to see if Landmark's assurances were truthful. As he stated in his deposition, Lookabaugh assumed that he would be fired from Catawba. Lookabaugh cannot base a constructive discharge claim based on an unsubstantiated assumption that his worst fears would come true. "Part of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions." Farris v. Port Clinton Sch. Dist., Ottawa App. No. OT-05-041, 2006-Ohio-1864, ¶ 64.
 {¶ 22} Lookabaugh has provided evidence that Spears had a deep-seated animosity toward him, and Lookabaugh suggests that he had reasonable fears that Spears would try to sabotage his employment. Lookabaugh, however, has presented no evidence that Landmark chose to transfer Lookabaugh as a prelude to termination. To the contrary, the evidence in the record indicates that Landmark offered Lookabaugh a transfer in order to serve the dual purpose of satisfying its customers' concerns about Lookabaugh working on their farms and of maintaining Lookabaugh's employment with the company. As Wical stated, he viewed the situation as a "win-win."
 {¶ 23} Lookabaugh argues that Landmark ceded control over his employment to Spears. We do not find that conclusion to be supported by record. According to Lookabaugh's January 18, 2007 affidavit, he asked Wallace on November 17, 2003 if Spears's "animosity would follow me to Catawba." Wallace had responded that he did *Page 10 
not think Spears would mind Lookabaugh working at Catawba. When Lookabaugh met with Wallace again on November 26, 2003, Wallace told Lookabaugh that he "had one of his men check with Spears and found out that it would be all right for [Lookabaugh] work at Catawba." By asking Spears if the proposed transfer would be agreeable to him, Landmark was not ceding control over Lookabaugh's employment. Rather, it is apparent that Landmark was both trying to determine if its solution would satisfy a significant customer's concerns and to allay Lookabaugh's concerns. The only reasonable inference from the record is that Landmark was attempting to both retain a valuable customer and continue Lookabaugh's employment.
 {¶ 24} Finally, the fact that Lookabaugh would no longer be able to visit his wife during lunchtime does not render the position at Catawba incomparable to the South Charleston position. Although Lookabaugh benefitted from living close to the South Charleston facility by being able to check on his wife at lunchtime, that benefit was a subjective reason for Lookabaugh preferring the South Charleston position. However, being able to go home at lunchtime was not a benefit of employment offered by Landmark to its employees. Lookabaugh was not promised that he could go home at lunchtime, and he indicated that he did not go home every day because he was not always in the area during lunchtime. His position with Landmark — whether at South Charleston or Catawba — required him to travel to customers' properties throughout the day. Although Lookabaugh would have preferred to work at the facility within a mile of his home, the addition of a ten to fifteen mile commute did not constitute a material change in the terms of his employment.
 {¶ 25} In summary, construing the evidence in the light most favorable to *Page 11 
Lookabaugh, the proposed transfer to the Catawba facility did not rise to the level of an adverse employment action, much less a constructive discharge. Moreover, we find no genuine issue of material fact that Lookabaugh was offered a comparable position at Catawba and that he chose not to accept it.
 {¶ 26} Because there is no genuine issue of material fact that Landmark did not terminate Lookabaugh's employment — expressly or constructively — the trial court properly granted summary judgment to Landmark on Lookabaugh's claim for wrongful discharge in violation of public policy and to Spears on Lookabaugh's claim for tortious interference with a business relationship.
 {¶ 27} Lookabaugh's first assignment of error is overruled. In light of our disposition of the first assignment of error, his second and third assignments of error are overruled as moot.
 {¶ 28} The judgment of the trial court will be affirmed.
 {¶ 29} FAIN, J., concurs.