[Cite as *Kelley v. Dayton Pub. Schools Bd. of Edn.*, 2024-Ohio-979.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| VENITA KELLEY | : | |
| | : | |
| Appellant | : | C.A. No. 29904 |
| | : | |
| v. | : | Trial Court Case No. 2021 CV 0558 |
| | : | |
| DAYTON PUBLIC SCHOOLS BOARD OF EDUCATION et al. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| Appellees | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on March 15, 2024

. . . . . . . . . . .

DAVID M. DUWEL, Attorney for Appellant

RICHARD L. MOORE & JESSICA T.S. SEXTON, Attorneys for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Dr. Venita Kelley appeals from the trial court's grant of summary judgment to the Dayton Public Schools Board of Education (DPS) and Dr. Elizabeth Lolli on Kelley's race discrimination and sex discrimination claims. For the following reasons, the trial court's judgment will be affirmed.

# I. Facts and Procedural History

**{¶ 2}** Construed in the light most favorable to Kelley, the record reveals the following facts. In early August 2017, DPS hired Kelley, an African-American woman, as its director of strategic communication and community relations. According to the job description, her duties included, among other things, (1) planning and directing district-wide communication and community relations efforts to support DPS and the superintendent; (2) communicating positive and consistent messaging to internal and external audiences; (3) fostering professional relations with community organizations and members of the community to promote the district's initiatives and progress; (4) representing the district at community events; (5) developing highly-visible community events and programs to garner positive attention for the district and its programs; (6) overseeing community efforts of the district to maintain an effective, two-way communication system between the public and the school district; (7) developing programs to engage families and the community to support district initiatives; and (8) supervising communications department staff. Kelley Depo., Ex. 18. Kelley also performed additional tasks as assigned by the superintendent, most notably overseeing the district's Males of Color program and implementing a corresponding program for female students, Girls Achieve. Lolli Depo. at 51-52, 56-57; Kelley Depo. at 57.

**{¶ 3}** Five days later, the district hired Marsha Bonhart, also an African-American woman, as director of communications and media. Kelley and Bonhart collectively oversaw the district's communications department and shared supervisory responsibilities. Kelley indicated that Bonhart handled the media whereas she did most

of the written communication, but the positions were designed so each could perform the other's duties when needed. Kelley Depo. at 36-37. Both women were part of the executive cabinet and reported directly to the superintendent, who was then Dr. Rhonda Corr.

{¶ 4} When Kelley and Bonhart began working for DPS, Lolli had been employed by DPS as associate superintendent of curriculum instruction for 11 months. Lolli Depo. at 7-8. During that time, the communications department had been headed by a single individual. Superintendent Corr divided the communications job into the two positions into which Kelley and Bonhart were hired. Lolli Depo. at 18-19. Lolli had "very limited" interaction with Kelley while she was associate superintendent. Lolli Depo. at 16.

{¶ 5} On November 21, 2017, three months after Kelley began working for DPS, Corr was placed on administrative leave and Lolli began serving as DPS's acting superintendent. (DPS later hired Lolli as its superintendent.) Kelley reported directly to Lolli. At her first executive cabinet meeting as acting superintendent, Lolli stated that she would meet with only four executive cabinet members to plan for the district. Kelley Depo. at 25. Kelley was not among those included in future executive cabinet meetings, and Kelley testified that Lolli did not institute weekly Friday meetings with the excluded executive cabinet members, as she had indicated she would. *Id.* at 25, 28.

{¶ 6} In early December 2017, Lolli notified Kelley that she would no longer have supervisory authority over the Males of Color program. Lolli Aff., ¶ 7; Kelley Depo., Ex. 11-14. Dr. Gregory Roberson, an African-American male who was chief of the Office of Exceptional Children, was assigned to oversee the program. Lolli Aff., ¶ 10; Kelley Depo.

at 26, 28, 107-126. Kelley stated in her deposition that Board President Dr. Walker had said to both Corr and Lolli that a woman should not head a male department; both Corr and Lolli had relayed Walker's sentiments to her. Kelley Depo. at 55. Lolli acknowledged that she reassigned the Males of Color program at the request of the board. Lolli Depo. at 54. Kelley testified that Lolli also paused the Girls Achieve program. Kelley Depo. at 57.

{¶ 7} Around December 11, 2017, at Lolli's request, Kelley provided Lolli a copy of her job description. Kelley had modified the job description under which she had been hired to include assignments that she had received from Corr. See Kelley Depo., Ex. 17. Kelley indicated that she failed to include the Girls Achieve program, although Corr had assigned it to her. Kelley met with Lolli (and two others) in December 2017 to discuss the job description and Lolli's expectations. Lolli Depo. at 30. Kelley completed a SMART goals evaluation document, which was reviewed with Lolli on December 17, 2017. See Kelley Depo. at 72, Ex. 4.

{¶ 8} Lolli also asked Kelley to produce a strategic communications plan by Friday, January 5, 2018. E.g., Lolli Depo. at 27. Kelley emailed Lolli on the due date, indicating that the requested plan was attached but to consider the document a draft. Kelley Depo., Ex. 5. Lolli responded on January 6 that nothing had been attached, and she reached out to Kelley again on January 8. Id., Ex. 5-6. Kelley provided a revised plan on January 10, unaware that Lolli had not received her prior version. Id., Ex. 7. Lolli forwarded the plan to a communications firm in Cleveland, but not to DPS personnel. Lolli did not believe that it would be possible to implement Kelley's plan, but she did not

provide feedback to Kelley.    Lolli Depo. at 50.

{¶ 9} Although their offices were next to each other, Kelley and Lolli had few in-person interactions about Kelley's progress on her job responsibilities.    Kelley described quick conversations as Lolli was heading to other meetings.    *See* Kelley Depo. at 177, 192.

{¶ 10} On January 25, 2018, Lolli again met with Kelley for a preliminary evaluation of Kelley's SMART goals and performance.    Kelley Depo. at 72, 92.    Kelley was rated "developing" in multiple categories and "skilled" in others (the rating scale was ineffective, developing, skilled, and accomplished).    Kelley Depo., Ex. 4.    Kelley noted on her copy of the evaluation form that Lolli was concerned that she had not received the strategic communications plan by January 5 and that Kelley had not responded to her emails. Kelley Depo. at 81, Ex. 4.

{¶ 11} On January 28, 2018, Kelley traveled to New York City to attend the National Mentoring CARES Movement event to foster a relationship between that group and DPS.  See Kelley Depo., Ex. 19.   She used the district's purchasing (credit) card ("P-card") to purchase her airfare, hotel stay, and a $1,000 ticket to the National Mentoring CARES gala.  *Id.*  Kelley had previously received training from the assistant treasurer regarding the protocol for making purchases and using the district's P-card.   (This training stemmed from the improper use of the P-card to buy pizza for a Males of Color trunk-or-treat event.)   Kelley Depo. at 131-137.   Kelley stated that she had received approval for the trip from the assistant treasurer.   Kelley Depo. at 170, Ex. 19.   However, she believed that she did not need to obtain approval for the trip from Lolli, explaining

"your budget, your decision." Kelley Depo. at 145-146. Kelley did speak with her counterpart, Bonhart, who had the P-card that she needed to use. *Id.*

{¶ 12} In late February 2018, Kelley used the P-card to purchase two tables for the YWCA Women of Influence luncheon at a cost of $2,400. Kelley Depo., Ex. 23. The tables were part of the Girls Achieve programming and allowed eight female students to attend the event. Kelley Depo. at 193-199, Ex. 23. Kelley stated in her deposition that she had emailed Lolli about the table reservations, as the two women were not meeting about Kelley's job duties and activities. Kelley Depo. at 194. Although Lolli emailed that she had not approved the table purchase, Kelley testified that she believed she had had authority to purchase the table reservations because she had control over her budget. Kelley Depo. at 205-206.

{¶ 13} On March 12, 2018, Lolli met with Kelley and presented her final evaluation of Kelley's job performance, which indicated that she would not be recommending the renewal of Kelley's contract with DPS. Kelley Depo. at 127, Ex. 15. In the narrative document, Lolli detailed several job responsibilities that Kelley had failed to perform satisfactorily. She addressed, among other things, Kelley's (1) failure to "keep stakeholders informed of initiatives and progress"; (2) working "in isolation"; (3) failure to respond timely to media inquiries; (4) failing to provide a strategic communications plan by January 5, 2018 and ultimately providing a 98-page document for review; (5) failing to promote highly visible events and programs; (6) improper and unauthorized use of the district's purchasing card, such as to buy pizza for a Males of Color event and to reserve tables at the YWCA Women of Influence event; and (7) failing to collaborate with team

members. Lolli also stated that Kelley had not provided updated SMART goals, as requested, and had numerous absences that had not been approved. Kelley Depo., Ex. 15. During her deposition, Lolli could not recall any specific actions that she had taken to try to improve Kelley's job performance. Lolli Depo. at 71.

{¶ 14} Kelley was placed on administrative on April 27, 2018. In May, Kelley received a copy of her final performance evaluation, which rated her as "ineffective" for most performance standards. Kelley Depo., Ex. 10. (The form showed both Lolli's preliminary rating (P) and final rating (F) for Kelley for each category.) The board later approved the nonrenewal of Kelley's contract and her termination, effective June 30, 2018. After Kelley's contract was not renewed, Bohnart took over Kelley's job responsibilities in addition to performing her own position's duties. Lolli Depo. at 19-20.

{¶ 15} In January 2019, Kelley filed suit against DPS, Lolli, and individual school board members, alleging race discrimination and sex discrimination, both in violation of R.C. 4112.02 (Montgomery C.P. No. 2019 CV 66). The defendants filed a joint answer denying the allegations and raising several affirmative defenses. DPS also brought counterclaims for fraud, conversion, and breach of contract, which Kelley denied. In early 2020, after DPS and Lolli moved for summary judgment, Kelley voluntarily dismissed the action pursuant to Civ.R. 41(A). Days later, DPS voluntarily dismissed its counterclaims.

{¶ 16} On February 10, 2021, Kelley brought this action against DPS and Lolli, raising the same race discrimination and sex discrimination claims. DPS again asserted counterclaims for fraud, conversion, and breach of contract. The parties attempted

mediation, but it was unsuccessful.

{¶ 17} In August 2022, DPS and Lolli moved for summary judgment on Kelley's claims. They argued that Kelley could not establish a prima facie case of race discrimination because she had been replaced by a member of her protected class (Bonhart) and could not point to similarly situated employees who had been treated differently. They further claimed that they had had several legitimate, nondiscriminatory reasons for choosing not to renew Kelley's contract, and that Kelley could not show that the reasons were pretextual. Moreover, DPS and Lolli argued that Kelley's sex discrimination claim failed because she had not suffered an adverse employment action when her Males of Color program duties were reassigned. Additionally, Lolli claimed that she was immune from liability and that the claims against her in an official capacity were redundant. Finally, both DPS and Lolli argued that punitive damages could not be awarded against a political subdivision. They supported their motion with Kelley's deposition and an affidavit from Lolli with Kelley's and Bonhart's job descriptions attached.

{¶ 18} In February 2023, after receiving additional time to respond to the summary judgment motion under Civ.R. 56(F), Kelley filed her opposition memorandum. She asserted that there were "material issues" as to why Kelley had been removed as manager of the Males of Color program, why the Girls Achieve programs had been placed on hold, and why she had been terminated "for attempting to carry out her responsibilities for diversity advancement, gender equity and cultural competency." Kelley further argued that Bonhart could not perform her duties, which dealt exclusively with diversity and minority issues. Kelley supported her response with her own deposition and Lolli's

deposition.

{¶ 19} On May 25, 2023, the trial court agreed with DPS and Lolli's arguments and granted their motion for summary judgment. Approximately three months later, DPS dismissed its counterclaims against Kelley pursuant to Civ.R. 41(A).

{¶ 20} Kelley appeals from the trial court's grant of summary judgment, challenging its conclusions that Kelley had failed to establish genuine issues of material fact as to her race and sex discrimination claims and that DPS was entitled to judgment as a matter of law. Kelley does not contest that she could not recover punitive damages and that Lolli was entitled to statutory immunity.

## II. Summary Judgment Standard

{¶ 21} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). The substantive law of the claim or claims being litigated determines whether a fact is "material." *Perrin v. Cincinnati Ins. Co.*, 2020-Ohio-1405, 153 N.E.3d 832, ¶ 29 (2d

Dist.).

{¶ 22} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 23} We review the trial court's ruling on a motion for summary judgment de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012-CA-18, 2013-Ohio-2767, ¶ 42. De novo review means that this court uses the same standard that the trial court should have used, and we examine all the Civ.R. 56 evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2d Dist. Champaign No. 2015-CA-2, 2015-Ohio-4297, ¶ 8.

### III. Kelley's Discrimination Claims

{¶ 24} Kelley's assignments of error claim that the trial court erred in determining that she failed to establish claims of race and sex discrimination that could survive summary judgment. She argues that genuine issues of material fact exist but has cited no legal authority related to her discrimination claims.

{¶ 25} R.C. 4112.02 provides that it is an unlawful discriminatory practice "[f]or any employer, because of the race * * * [or] sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or

indirectly related to employment."   R.C. 4112.02(A).

{¶ 26} An employment discrimination claim under R.C. 4112.02 may be proven either by direct or circumstantial (indirect) evidence.   *Saunders v. Greater Dayton Regional Transit Auth.*, 2d Dist. Montgomery No. 28942, 2021-Ohio-3052, ¶ 24.   Direct evidence of discrimination "is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in the employer's adverse employment decision.   *Id.*, quoting *Conley v. U.S. Bank Natl. Assn.*, 211 Fed.Appx. 402, 405 (6th Cir.2006).   If direct evidence of a discriminatory animus has been shown, the employer must establish that it would have made the same decision absent the discriminatory motivation.   *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir.2002).   Because employers typically do not announce their discriminatory intent, direct evidence of discrimination is rare.   *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997); *Provitt v. J.T. Thorpe & Son, Inc.*, N.D.Ohio No. 4:22-CV-486, 2023 WL 8357442, *3 (Nov. 30, 2023).

{¶ 27} Absent direct evidence of discrimination, an employee must proceed under the burden-shifting, indirect-evidence approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).   *Grooms v. Supporting Council of Preventative Effort*, 157 Ohio App.3d 55, 2004-Ohio-2034, 809 N.E.2d 42, ¶ 20 (2d Dist.).   Under that approach, the employee must first prove, by a preponderance of the evidence, a prima facie case of discrimination.   *Saunders* at ¶ 26.   To accomplish this, an employee is required to establish that they (1) are a member of a protected class; (2) were subject to an adverse employment decision; (3) were qualified for the position;

and (4) were replaced by someone outside the protected class or were treated differently from similarly-situated non-protected colleagues.   *See id.*

**{¶ 28}** If the employee establishes a prima facie case, the burden of production then shifts to the employer who "must articulate a non-discriminatory reason for taking an adverse employment action against the employee."   *Grooms* at ¶ 21, citing *McDonnell Douglas*.   If the employer is successful, the burden shifts back to the employee to prove that the stated non-discriminatory reason for the adverse action was pretextual.   *Id.*; *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, 179 N.E.3d 687, ¶ 50 (2d Dist.).

**A. Race Discrimination Claim**

**{¶ 29}** Kelley's first assignment of error asserts that the trial court erred in granting summary judgment to DPS on her race discrimination claim.   In its ruling, the trial court concluded that Kelley had not presented any direct evidence of race discrimination and, further, failed to establish the fourth prong of a prima face case based on circumstantial evidence.   As to Kelley's indirect case, the court reasoned that Kelley was replaced by Bonhart, who was also African-American, and thus Kelley failed to show that she was replaced by someone outside the protected class.   The court also stated that Kelley had pointed to two other executive cabinet members (Judy Spurlock and Jyllian Bradshaw), both Caucasian, as comparable employees, but the court found that Kelley "fail[ed] to articulate an argument, much less produce any evidence, showing Spurlock and/or Bradshaw are similarly situated or engaged in similar conduct."

**{¶ 30}** The trial court further concluded that, even if Kelley had established a prima facie case, DPS offered a legitimate non-discriminatory reason for the non-renewal of her

contract, "including ongoing performance deficiencies and repeated failure to perform all of her essential duties and responsibilities." The court noted that Kelley had "utterly fail[ed] to argue, much less produce evidence, that the issues raised by Defendants as examples of her ongoing performance deficiencies and repeated failure to perform all of her essential duties and responsibilities [were] untrue, did not actually motivate Defendants, or were insufficient to warrant her nonrenewal."

{¶ 31} On appeal, Kelley asserts that there was direct evidence of race discrimination. She cites the following examples:

- She was criticized for ordering pizza for a Males of Color program

- She was removed as manager of the Males of Color program and replaced by a male, whom she had to train

- She was removed of her responsibilities for the Girls Achieve program and the program was halted

- She faced charges for traveling to New York to meet with individuals to develop a partnership that would bring a University for Parents program to DPS

- She faced charges for purchasing tickets for eight female students to attend a YWCA Women of Influence event

Kelley further states that Lolli no longer permitted her to attend executive cabinet meetings and "continuously criticized [her] for not running matters past her before taking action on diversity matters."

{¶ 32} Construing the evidence in the light most favorable to Kelley, we discern no direct evidence of race discrimination. Although Kelley asserts that Lolli took adverse

actions against her because her position involved diversity and equity matters, Kelley has not pointed to *any* evidence that requires a conclusion that Lolli's personnel decisions regarding Kelley were due, even in part, to Kelley's race. Rather, a trier-of-fact would need to infer a discriminatory motive from Lolli's actions. The need to draw inferences prevents Kelley's examples from constituting direct evidence of race discrimination. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003) (store manager's comments about plaintiff were not direct evidence of race discrimination where factfinder would need to infer race discrimination).

{¶ 33} Turning to Kelley's indirect evidence of race discrimination, we agree with the trial court that Kelley has not provided evidence related to the fourth prong of her prima facie case, namely that she was replaced by someone outside her protected class or that similar-situated employees were treated differently. Kelley named Spurlock and Bradshaw as potential similarly-situated individuals during her deposition, but she did not mention them in responding to the summary judgment motion or on appeal. Consequently, Kelley did not demonstrate that any similarly-situated co-workers were treated differently. Accordingly, we focus on whether she was replaced by someone outside of her protected class.

{¶ 34} A "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir.2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990)); *see also Temple v. Dayton*, 2d Dist. Montgomery No. 20211, 2005-

Ohio-57, ¶ 87. "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.*,quoting *Barnes*, 896 F.2d at 1465; *Valentine v. Westshore Primary Care Assocs.*, 8th Dist. Cuyahoga No. 89999, 2008-Ohio-4450, ¶ 85.

**{¶ 35}** After Kelley's contract was not renewed, Bonhart assumed Kelley's job responsibilities. Lolli Depo. at 20. Lolli clarified that Bonhart continued to do her own job as well as Kelley's. *Id.* Because Bonhart undertook Kelley's job duties along with her own, Lolli's testimony indicated that Bonhart did not "replace" Kelley. Nevertheless, even assuming that Bonhart did replace Kelley, Kelley has not shown that she was replaced by someone outside her protected class, as Bonhart is also African-American.

**{¶ 36}** Kelley asserts on appeal that DPS actually eliminated her job after her contract was not renewed. She argues that Bonhart was unable to perform her (Kelley's) job duties, which dealt exclusively with diversity and minority issues.

**{¶ 37}** Kelley does not identify any evidence showing that DPS did not assign Kelley's job responsibilities to Bonhart. Regardless, the elimination of Kelley's position would not satisfy the fourth prong. Rather, in the absence of evidence that Kelley was replaced by a person outside her protected class, Kelley cannot establish a prima facie case of race discrimination. Only in reduction-in-force situations (which is not the case here) has the fourth prong been modified to allow evidence of discriminatory intent when an employee is not replaced. *See Stover v. Myocare Nursing Home Inc.*, 2016-Ohio-2729, 64 N.E.3d 290, ¶ 11 (8th Dist.) ("In RIF cases, the fourth prong of the prima facie test is modified to require the employee to offer additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled him or her out for

impermissible reasons.").

{¶ 38} Because Kelley failed to satisfy the fourth prong of her prima facie case, the trial court properly granted summary judgment to DPS on her race discrimination claim. Moreover, we further agree with the trial court that DPS offered several legitimate, nondiscriminatory reasons for the nonrenewal of Kelley's contract and that Kelley failed to offer evidence that its reasons were pretextual.

{¶ 39} Kelley's first assignment of error is overruled.

**B. Sex Discrimination Claims**

{¶ 40} In her second assignment of error, Kelley challenges the grant of summary judgment to DPS on her sex discrimination claim. She highlights her removal as supervisor of the Males of Color program, the halting of the Girls Achieve program, and the discipline she faced for purchasing tables at the YWCA Women of Influence event, which was included as a justification for the nonrenewal of her contract.

{¶ 41} In her deposition, Kelley stated that the board's president, Walker, had said to both Corr and Lolli that a woman should not head a male department and that both Corr and Lolli relayed Walker's sentiments to her. Kelley Depo. at 55. Kelley testified that Lolli told her of Walker's statement in one of their first meetings after Lolli became acting superintendent, and Lolli expressed to Kelley that she "had faced that kind of sexism in her career." Kelley Depo. at 56. Kelley was removed as supervisor of the Males of Color program soon thereafter. An email from Roberson sent on December 4, 2017 establishes that the Males of Color program was reassigned to him on or prior to that date. Kelley Depo. at 114, Ex. 12.

{¶ 42} Kelley further testified that Corr had assigned her to implement the Girls Achieve program, a corresponding program to the Males of Color program, which was needed to bring the district into compliance with Title IX. Kelley Depo. at 61. According to Kelley, Lolli instructed her to pause development of the Girls Achieve program within a month of Lolli's being named acting superintendent. Kelley stated that planning on that program never resumed, Kelley Depo. at 57-58, but she later indicated that Girls Achieve planning was still occurring in February 2018 when she purchased tables for the YWCA Dayton's Women of Influence event. Kelley Depo. at 197.

{¶ 43} In addressing DPS's summary judgment motion, the trial court concluded that "it could be said that the Board influenced Dr. Kelly's [sic] removal as Supervisor of the Males of Color Program and thus a genuine issue of material fact [exists] as to whether the alleged comment constitutes direct evidence of gender discrimination, at least in relation to Dr. Kelley's removal as Supervisor of the Males of Color Program." The court nevertheless granted summary judgment to DPS on Kelley's sex discrimination claims on the ground that Kelley's removal as supervisor of the Males of Color program did not constitute an adverse employment action. The court noted that the nonrenewal of Kelley's contract was "undoubtedly" an adverse employment action but found no reasonable nexus between Walker's statement and Kelley's termination. Finally, reiterating that Kelley was replaced by a person in her protected class, the court found that Kelley had failed to identify a similarly-situated individual outside her protected class.

{¶ 44} We agree with the trial court that Kelley has presented direct evidence that her gender was at least a motivating factor in her removal as supervisor of the Males of

Color program. We further agree, however, that Kelley has not presented evidence that the removal of the Males of Color program from her job responsibilities constituted an adverse employment action.

{¶ 45} An "adverse employment action" is conduct that results in a materially adverse change in the terms and conditions of employment. *Lookabaugh v. Spears*, 2d Dist. Clark No. 2007-CA-16, 2008-Ohio-1610, ¶ 16; *Anderson v. Bright Horizons Children's Centers, LLC*, 10th Dist. Franklin No. 20AP-291, 2022-Ohio-1031, ¶ 38. In general, an adverse employment action occurs when it results in a material change in wage or salary, a less distinguished title, a material loss in benefits, significantly diminished material responsibilities, or other indices that might be unique to the particular situation. *Id.*; *Moody v. Ohio Dept. of Mental Health & Addiction Servs.*, 2021-Ohio-4578, 183 N.E.3d 21, ¶ 27 (10th Dist.). "Employment actions that result in mere inconvenience or an alteration of job responsibilities are not disruptive enough to constitute adverse employment actions." *Canady v. Rekau & Rekau, Inc.*, 10th Dist. Franklin No. 09AP-32, 2009-Ohio-4974, ¶ 25, citing *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir.2004).

{¶ 46} According to Lolli, Kelley's removal as supervisor of the Males of Color program did not result in any change in Kelley's pay or benefits, Lolli Aff., ¶ 8, and Kelley does not dispute that assertion. Kelley also does not assert that the loss of her supervisory responsibilities over the Males of Color program significantly diminished her material job responsibilities. Accordingly, Kelley has failed to create a genuine issue of material fact that her removal as supervisor of the Males of Color program amounted to

sex discrimination. The same is true with Lolli's alleged decision to pause the Girls Achieve program, which she was developing at the prior superintendent's instruction.

{¶ 47} The nonrenewal of Kelley's contract resulted in the termination of her employment with DPS and, thus, clearly constituted an adverse employment action. Kelley argues on appeal that this was the culmination of her removal from the executive cabinet, which impacted her ability to interact with her peers and Lolli. Kelley emphasizes that Lolli frequently complained that she (Lolli) did not know or understand what Kelley was doing. She also points to the discipline she faced for purchasing tickets for the YWCA program for several female students. Kelley states, "The bottom line is that Dr. Lolli was not interested in promoting gender equity issues."

{¶ 48} Even accepting, for the sake of argument, that Lolli had no interest in programs that promoted gender equity, Kelley has not presented evidence that her termination was due to her gender. Kelley failed to present any direct evidence of sex discrimination related to her termination. Walker's statement did not suggest that Kelley, as a woman, should not hold her position of director of strategic communication and community relations, and there is no suggestion that his statement influenced Lolli's recommendation that Kelley's contract not be renewed.

{¶ 49} Nor did Kelley demonstrate a prima facie case of sex discrimination using circumstantial evidence. There is no evidence that Kelley was replaced, as Lolli explained that Bonhart absorbed Kelley's duties along with her own. Even assuming that Kelley was replaced after her contract was not renewed, the communications department was led by Bonhart, another woman. Moreover, Kelley failed to identify a similarly-

situated male who was treated differently from her.   Accordingly, the trial court properly granted summary judgment to DPS on Kelley's sex discrimination claim.

**{¶ 50}** Kelley's second assignment of error is overruled.

### IV. Conclusion

**{¶ 51}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.